**In re MESABA AVIATION, INC., dba Mesaba Airlines, Debtor.**

**No. BKY 05–39258.**

United States Bankruptcy Court, D. Minnesota.

May 18, 2006.

---

Kenneth B. Hipp, Marr Hipp Jones & Wang LLLP, Honolulu, HI, Alan L. Kildow, DLA Piper Rudnick Gray Cary, Minneapolis, MN, Michael F. McGrath, Michael L. Meyer, Will R. Tansey, Ravich Meyer Kirkman & McGrath Nauman, Minneapolis, MN, Connie Lahn, Fafinski Mark & Johnson, P.A., Eden Prairie, MN, Craig D. Hansen, Squire Sanders & Dempsey LLP, Phoenix, AZ, Scott A. Kane, Stephen D. Lerner, Gregory A. Ruehlmann, Squire Sanders & Dempsey LLP, Cincinnati, OH, Thomas Lallier, Foley & Mansfield P.L.L.P., Minneapolis, MN, Tim J. Robinson, Aquire Sanders & Dempsey LLP, Columbus, OH, for Debtor.

## ORDER DENYING DEBTOR'S MOTION FOR AUTHORITY TO REJECT COLLECTIVE BARGAINING AGREEMENTS

GREGORY F. KISHEL, Chief Judge.

This proceeding came on before the Court for an evidentiary hearing on the motion of the Debtor under 11 U.S.C. §§ 1113 and 365(a), for authority to reject its collective bargaining agreements with the Air Line Pilots Association, International ("ALPA"), the Association of Flight Attendants–CWA, AFL–CIO ("AFA"), and the Aircraft Mechanics Fraternal Association ("AMFA"). The hearing was conducted on February 24, 27, and 28, and March 3, 6–9, 13–14, and 20–24, 2006. The Debtor appeared by its special labor counsel, Kenneth B. Hipp and Cynthia M. Surrisi, of Marr Hipp Jones & Wang, LLLP, Honolulu, and by its Chapter 11 counsel, Michael L. Meyer, of Ravich Meyer Kirkman McGrath & Nauman, Minneapolis. ALPA appeared by its attorneys, James L. Linsey and Joseph J. Vitale, of Cohen, Weiss and Simon, LLP, New York, and by James M. Jorissen, of Leonard, O'Brien, Spencer, Gale, & Sayre, Ltd., Minneapolis. The AFA appeared by its attorneys, Robert S. Clayman, of Guerrieri, Edmond, Clayman & Bartos, P.C., Washington, D.C., and Joel D. Nesset of Henson & Efron, P.A., Minneapolis. AMFA appeared by its attorney, Nicholas P. Granath, of Seham, Seham, Meltz & Petersen, LLP, Minneapolis. MAIR Holdings, Inc. ("MAIR" or "MAIR Holdings") appeared by its attorney, Lenard M. Parkins, of Haynes and Boone, LLP, Houston. The Unsecured Creditors Committee appeared by its attorneys, Scott A. Kane and Sean T. Cork, of Squire, Sanders & Dempsey, LLP, Cincinnati and Phoenix, and Thomas J. Lallier, of Foley & Mansfield, PLLP, Minneapolis. Upon the evidence received over the course of the hearing, the briefs and arguments of counsel, and other relevant files and proceedings in this case that were made a part of the record, the Court memorializes the following decision.

### THE RELEVANT PARTIES

The Debtor filed a voluntary petition for reorganization under Chapter 11 on October 13, 2005. The Debtor is an airline, currently doing business as a "regional airlink partner" of Northwest Airlines ("Northwest"). Since 1984, it has contracted with Northwest in various capacities to transport passengers from smaller and more remote airports to one of Northwest's three hub locations at Minneapolis–St. Paul, Detroit, and Memphis.

Northwest itself has been in Chapter 11 in the Southern District of New York since September 14, 2005. This circumstance is one of those that makes the Debtor's case nearly unique among those of the airlines that have sought relief under 11 U.S.C. § 1113.

As of the commencement of the case, the Debtor was a party to collective bargaining agreements with four unions that repre-

sented specific groups of its employees, namely ALPA, AFA, AMFA, and the Transport Workers Union of America ("TWU").[1] Before the Debtor's bankruptcy filing, these collective bargaining agreements and the parties to them were subject to the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.* The remainder of the Debtor's employees—consisting of management personnel, directors and officers, customer service agents, and "non-contract hourly" employees (crew schedulers, stock clerks, and administrative personnel)— were not unionized.

All of the Debtor's outstanding stock is owned by MAIR Holdings. MAIR itself is a publicly-held and –traded company. At the times relevant to this motion, Northwest held 27.5% of the shares in MAIR. The remainder were held by over six hundred shareholders.

## MOTION AT BAR

The Debtor has moved for authority to reject its collective bargaining agreements with ALPA, AFA, and AMFA.[2]

In the first instance, the Debtor is vested in the right to seek such relief by 11 U.S.C. § 365(a).[3] 11 U.S.C. § 1113, however, sets the specific requirements for rejection of a collective bargaining agreement that must be met by the Debtor. 11 U.S.C. § 1113(a) ("The debtor in possession ... may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.").

■■■ As this Court's senior member remarked shortly after the enactment of § 1113, the statute "is not a masterpiece of draftsmanship ..." *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn. 1984) (Kressel, J.). Nonetheless, as Judge Kressel observed, "nine requirements for court approval of the rejection of collective bargaining agreements can be gleaned from § 1113." *Id.* As counsel here have acknowledged, the requirements of § 1113 include some that are procedural in orientation, and others that are substantive in nature. A debtor-in-possession that would reject a collective bargaining agreement must prove up the economic merits of a proposed alternative to the terms of the collective bargaining agreement, which must comply with the statute's prescriptions. In addition, it must show that it went through fairly exacting procedures to air its proposal to the union(s), to try to prevail upon the union(s) to accept those merits, and that the union(s) "refused to

1. For three of the four unions, the type of employee represented is obvious from the organizational title. The TWU represents the Debtor's dispatchers.

2. Before the hearing on this motion, the TWU agreed to certain modifications of its members' wages and benefits, and the Debtor forwent its right to seek authority to reject its collective bargaining agreement with the TWU. The Court approved that stipulation by an order entered on January 31, 2006. Under the stipulation, the commencement of wage and benefit reductions for the TWU's members is contingent on the Debtor obtaining similar reductions of the labor costs attributable to the members of the other three unions, whether that be via consensual agreement or via rejection of their collective bargaining agreements and unilateral imposition of the cuts.

3. The bare-bones text of this statute is: "... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." As a debtor-in-possession under Chapter 11, the Debtor has "all of the rights ... and powers ... of a trustee serving" in a Chapter 11 case. 11 U.S.C. § 1104(a). In *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Supreme Court recognized that those powers include the rejection of executory contracts under § 365(a), and that a collective bargaining agreement with a union is an executory contract within the meaning of § 365(a).

accept such a proposal without good cause," § 1113(c)(2). *United Food and Comm'l Workers Union, Local 328, AFL–CIO v. Almac's, Inc.,* 90 F.3d 1, 6 (1st Cir.1996); *In re Mile Hi Metal Sys., Inc.,* 899 F.2d 887, 891–892 (10th Cir.1990); *In re Carey Transp., Inc.,* 816 F.2d 82, 88 (2d Cir.1987); *In re Century Brass Prods., Inc.,* 795 F.2d 265, 273 (2d Cir.1986); *In re Wheeling–Pittsburgh Steel Corp.,* 791 F.2d 1074, 1081 (3d Cir.1986). The burden of production of evidence on some of the elements of the procedural side may shift over to the respondent union. *In re American Provision Co.,* 44 B.R. at 909–910. However, the burden of persuasion as to all of the statute's requirements remains with the debtor-movant. *Id.* at 910.

■ A welter of evidence was put before this Court in a grueling four-week evidentiary process. It is nearly overwhelming in its length, variety, complexity, and (at times) technicality. Given the severe time constraints for rendering of decision that Congress inflicted on the hapless presiding jurist,[4] the most traditional format of trial court decision does not conduce. An exacting recitation of found facts and a regurgitation of the same content in extended conclusions of law just is not feasible; and, it is not likely to be the most illuminating exposition anyway. The enormity of this all requires something different, portentous as it is in size of record, cacophony of issues, and ultimate consequence to individuals, constituencies, and regional economy alike. Some initial recap of the transactional history is appropriate, to lay out a context. However, to best effect, the treatment of the issues should be structured by the nine requirements identified in *American Provision Co.,* albeit with those elements marshaled to procedural and substantive sides.[5]

## TRANSACTIONAL AND CONTRACTUAL BACKDROP

Ultimately, the substantive side of the Debtor's burden comes down to a matter of economics. In a Chapter 11 case, of course, those economics rest on a debtor's ability to generate income. For the relevant portion of this Debtor's history, that income was derived in nearly-full proportion from contracting with another business, by providing one set of services to the order of only one customer. This, of course, was through the Debtor's airlink

---

**4.** "The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing," subject to an extension "for such additional period as the trustee and employees' representative may agree to." 11 U.S.C. § 1113(d)(2). Here, the parties stipulated to several extensions of the deadline for rendering of decision, but the preparation of this memorandum had to go forward during each interval nonetheless.

**5.** To make it clear, for any subsequent review: the "Discussion" section of this decision will contain a blend of findings of fact and conclusions of law, segregated out by the individual statutory elements. The use of the *American Provision Co.* analysis as the organizational structure is not a matter of personal or institutional loyalty; numerous other courts have recognized that decision as an early, accurate, and concise distillation of the appropriate considerations under § 1113. *In re Family Snacks, Inc.,* 257 B.R. 884, 892 (8th Cir. BAP 2001) (citing David Keating, *The Continuing Puzzle of Collective Bargaining Agreements in Bankruptcy,* 35 WM. & MARY L.REV 503, 511–512 (1994)). *See also, e.g., In re Carey Transp., Inc.,* 816 F.2d at 88; *In re Wheeling–Pittsburgh Steel Corp.,* 791 F.2d at 1080; *In re Mile Hi Metal Systems, Inc.,* 899 F.2d at 891–892; *In re Sierra Steel Corp.,* 88 B.R. 314, 315 (D.Colo.1987); *Int'l Union, UAW v. Gatke Corp.,* 151 B.R. 211, 212 (N.D.Ind.1991); *In re Appletree Markets, Inc.,* 155 B.R. 431, 437 (S.D.Tex.1993); *In re Elec. Contracting Serv. Co.,* 305 B.R. 22, 26 (Bankr.D.Colo.2003); and *In re National Forge Co.,* 279 B.R. 493, 499 (Bankr.W.D.Pa.2002).

partner relationship with Northwest.[6] For the relevant future, the Debtor will continue to position itself in the airline industry in the same way, as a "regional carrier" feeding passengers into "mainline" or "network" carriers under contract with them.[7] From 1996 until 2005, it was bound exclusively to Northwest to provide this service under two Airline Service Agreements ("ASAs"), each covering a separate component of the Debtor's fleet of aircraft. However, at present the Debtor is not tied to Northwest on an exclusive basis, and it may well not be tied in that way ever again.

This is all a product of the succession of ASAs under which the Debtor has served Northwest. These ASAs have been identified to packages of business that are defined by the type of aircraft the Debtor has flown for Northwest. As of early 2005, the Debtor had a fleet of 98 aircraft total, consisting of two components: 63 Saab 340 turbo-prop airplanes ("Saabs"), and 35 Avro 69–seat, four-engine regional jets, manufactured by British Aerospace ("Avros" or "ARJs"). The Debtor had separate, free-standing ASAs with Northwest for each fleet component. In April, 2005, Northwest awarded the Debtor the right to fly CRJ–200/440 50–seat, two-engine regional jets, manufactured by Bombardier ("CRJs"). This award was for a total of 15 CRJs initially, augmentable via an exclusive right in the Debtor to fly

additional CRJs for Northwest (up to 20 if Northwest decided to add them to its fleet), and by a right in Northwest to place up to 150 additional CRJs with the Debtor.

Under the 1996–2005 ASAs, Northwest leased nearly all of the subject aircraft from third parties and then subleased them to the Debtor. Northwest retains substantial power to alter the routing and scheduling of the flights that the Debtor services; and, hence, it has the right to ground aircraft if it reduces service to particular destinations. This, of course, results in lessened revenues for the Debtor.

Under the several sorts of their ASA relationships, the Debtor agrees to use the aircraft subleased from Northwest to operate those flights designated by Northwest in its discretion, under the standards for performance specified in the ASA. In return, Northwest pays the Debtor for the provision of the flying service, in a base amount calculated by the number of "block hours" flown times a stated rate.[8] The ASA contains complicated formulas in relation to this and other forms of payment to the Debtor. The details are not relevant to the matter at bar.

This "fee for departure" arrangement is common in the network carrier-regional carrier relationship. The mainline sets all rates for charges to the individual flying

---

**6.** For the first half of its existence, the Debtor was a "free-standing" airline that provided service directly to the consuming public, by air shuttle arrangements after its founding in 1944 and then by scheduled air service from 1973 on. That history has no bearing at this point.

**7.** For the remainder of this decision, the terms "mainline," "mainline carrier," and "network carrier" will be synonymous. (This does not necessarily comport with the fussy precision of legal writing style, but it does mirror industry parlance—and it will give a

bit of stylistic variation to break the ennui of reading a long decision.) "Legacy carrier" will signify those mainlines that were in existence before, say, 1990, or are in direct descent from carriers that were, via merger or acquisition.

**8.** A "block hour" is the industry's unit of measure for the duration of a flight—literally running from when the blocks securing the aircraft's tires are removed to enable taxi-out, to when the blocks are put back under at the destination.

customers and freight shippers, and it alone receives and keeps all revenues from this provision of retail service to the public. The regional, in turn, is only a provider of the flying service to the network carrier; it has no control over or access to the customer-derived revenues that are generated directly from the exploitation of the aircraft in service.

Under the 1996–2005 ASAs, the Debtor was prohibited from providing airlink service to any mainline other than Northwest.

As the Debtor's parent company, MAIR received payment from the Debtor over the years. These payments were made under various denominations, including consideration for the provision of "management services" to the Debtor under an agreement executed in 2003. The services included the provision of directors' and officers' liability insurance and audit support services to the Debtor; advice and consultation on negotiations with Northwest (including the formulation of the Omnibus ASA) and aircraft manufacturers and vendors; and "significant legal counsel." During the period of overlap of their respective employments, John G. Spanjers—the Debtor's President and Chief Operating Officer—and Paul Foley—MAIR's Chief Executive Officer and President—consulted very frequently and intensely, often on a daily basis.[9]

In the spring and summer of 2005, it was widely known that Northwest was experiencing significant financial distress. Speculation that Northwest would seek protection under Chapter 11 was rampant in the regional and national media, given that other legacy carriers like United Airlines and U.S. Airways were already in bankruptcy at the time.

At the same time, representatives of the Debtor and Northwest were negotiating over the two companies' overall relationship. These negotiations centered around the fact that the aircraft in the Debtor's Saab and Avro fleets were in blocks with different lease durations, and the Debtor had just obtained an entirely new line of business and potential expansion through the CRJ award. With the advice of counsel, the Debtor's management had concluded by mid-summer that the Debtor would be best off to obtain and execute a comprehensive single ASA with Northwest, bringing together the operation of all three components of the Debtor's fleet under one contract. In their mind it was key that this be done before Northwest went into Chapter 11. The idea was that having a unitary contractual relationship would make it more legally onerous for Northwest to reject outright under § 365(a), to "cherry-pick" those parts of the Debtor's operation that would be most advantageous to Northwest and abandon the rest, or to interrupt its post-bankruptcy performance in any way. This way, the Debtor's management concluded, the Debtor's interests in continued flying for Northwest would be better protected, whatever the outcome of Northwest's decision regarding bankruptcy.

As a result, during August, 2005, representatives of the Debtor, MAIR, and Northwest negotiated an Omnibus ASA. That document was executed by the Debtor and Northwest on August 29, 2005. On the same date, MAIR and Northwest executed an agreement that memorialized certain obligations that MAIR was undertaking "as partial inducement for Northwest to enter into the [Omnibus] ASA." The relevant ones among these obligations were a reconfiguration and repricing of

---

9. Foley has had over 32 years of experience in the airline industry. He served jointly as President of the Debtor and of MAIR from September, 1999 to October, 2002.

certain warrants for the purchase of additional stock in MAIR that had been previously issued to Northwest but not yet exercised by it; a requirement that MAIR make a "one-time cash contribution" (denominated as a "Capital Contribution") of $37,100,000.00 to the Debtor, within three business days of August 29, 2005; and a right in Northwest to "nominate and recommend for election by the shareholders of MAIR" a number of directors such that three directors designated by Northwest would be on MAIR's board if those nominees were elected.

Shortly after the Omnibus ASA was executed, Northwest had the first two CRJs delivered to the Debtor, to be put into service under the 15–unit award. On September 7, 2005, MAIR timely paid the $37,100,000.00 "cash contribution" to the Debtor.

In early September, 2005, it seemed to the Debtor's management that the Debtor had reasonably bright prospects before it, despite the contemporaneous reports about Northwest. The commencement of CRJ delivery represented the Debtor's first entry in years into a new line of service, and one that seemed to be the future of the regional industry. The groundwork was laid for a more predictable future for the Saab and Avro fleets. In 2007 the Omnibus ASA would permit a resetting of the profit margin recoverable by the Debtor via its rates. The Omnibus ASA had a ten-year term, promising a long-term stable base of operations. And the Debtor was freed of the exclusivity provisions of the 1996–2005 ASAs: it now could take airlink work for other carriers, as long as that did not feed into any of Northwest's three hubs. On several occasions over the ensuing weeks, representatives of Northwest told the Debtor's senior management that Northwest intended to abide by the terms of the Omnibus ASA.

However, within two weeks of executing the Omnibus ASA, Northwest put itself into Chapter 11. Contemporaneously, or within three weeks of that, Northwest:

1. withheld a total of $36,000,000.00 in payments to the Debtor under the Omnibus ASA, which were due immediately pre-and post-petition in Northwest's case;

2. gave the Debtor notice to withdraw a total of 19 Saab and Avro aircraft from service in the very near future;

3. gave the Debtor notice that it was canceling the subleases on all of the remaining Avro aircraft, effective December, 2005; and

4. advised the Debtor that it would not place the remainder of the 15 CRJs into service with the Debtor.

The Debtor was eventually able to prevail on Northwest to defer the withdrawal of most of these Saabs and the Avros, to later dates. However, it was immediately thrown into financial crisis by the accompanying reduction in scheduled flights, the withholding of payment under the ASA, and the refusal to place the 13 CRJs.[10] The Debtor's management went through a monthlong evaluation of options with counsel and financial consultants, using a quickly-constructed software model.[11] On the

---

**10.** Both Spanjers and Foley credibly testified to having been thunderstruck by Northwest's default in the very first payment due under the Omnibus ASA. They had honestly, and reasonably, assumed that Northwest would follow through, given the long period of hard bargaining that went into the Omnibus ASA, the general pretense of assurance that North-west had projected in connection with it, and the near-coincidence of its execution with Northwest's Chapter 11 filing.

**11.** The Debtor had hired Mercer Management Consulting, Inc. ("Mercer" or "Mercer Management"), to assist its board and management in evaluating the prospects of a bank-

basis of their recommendation, the Debtor's board of directors authorized its management to file a petition under Chapter 11. As required by the respective companies' bylaws, MAIR's board gave the same authorization after a presentation by the Debtor's representatives.[12]

Through the adjournment of the hearing on the Debtor's motion, Northwest had taken no action to reject the Omnibus ASA.

## DISCUSSION

### I. Remedy of Rejection, as Applied to the Unions' Collective Bargaining Agreements.

■■ As the courts noted early after its enactment, § 1113 imposes both procedural and substantive requirements on a debtor-in-possession that seeks to reject a collective bargaining agreement:

> Section 1113 ... created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion. Employers may only propose modifications in an existing labor contract that are necessary to permit an effective reorganization of the debtor. Further, the debtor must propose these modifications to the union before seeking approval to reject its collective bargaining agreement. [citation omitted] Only if the expedited bargaining fails does § 1113 permit a debtor to apply for rejection of the labor agreement.

*In re Century Brass Prods., Inc.*, 795 F.2d at 272. Preserving the numbering of the elements as set forth in the *American Provision Co.* analysis, they fall into these categories as follows:

### A. Procedurally–Oriented Elements

The first group of elements goes to the way in which the debtor-in-possession brings forward its proposal, and the actions it takes to try to head off the need for formal relief under § 1113.

*1. The Making of a Proposal to Modify the Collective Bargaining Agreements.*

The debtor-in-possession must first show that it has made a proposal to its union(s), for a modification of their collective bargaining agreements. 11 U.S.C. § 1113(b)(1)(A); *In re American Provision Co.*, 44 B.R. at 909.

Here, once it was under the protection of Chapter 11, the Debtor continued to work with its financial consultant for bankruptcy issues, Mercer Management. After building out the Mercer Model to make it "dynamic," i.e., to project profitability on the basis of complex input of data on revenues and expenses, the Mercer consultants and the Debtor's management fed it data based on historical operations, plus certain assumptions on fleet size, income generation, and a desired post-restructuring profit margin. Their goal was to arrive at the aggregate amount by which the Debtor's costs of operation would have to be cut in order to sustain it as a going concern after all of Northwest's actions had come to

ruptcy filing. Using the Excel spreadsheet program for a base, Mercer's financial professionals created an application to "model" the Debtor's anticipated financial position under alternate scenarios, in and out of bankruptcy. Using this first version of the so-called "Mercer Model," the Debtor's management and Mercer came to the conclusion that the Debt-

or's best chances of survival lay in a filing under Chapter 11.

**12.** The Debtor's management and the Mercer consultants used the output of this early version of the model to assemble the presentations to the Debtor's and MAIR's boards.

fruition. Ultimately, they assumed that the Debtor would be reduced to a "steady-state" fleet of no more than 49 Saab turbo-prop aircraft by the end of 2006.[13]

The Debtor's management then identified four "key areas" through which to meet the cost-reduction goal identified by the first stage of the analysis. These were: an "operational restructuring" that focused on reducing fixed costs of administration and physical plant; a "vendor restructuring" that entailed renegotiating rates for the future provision of various goods and services to the Debtor; an "exercise of § 1110 rights," under which the Debtor used 11 U.S.C. § 1110 as a legal platform to pare out unneeded aircraft engines and parts from its inventory and to renegotiate rental rates and return terms on other such assets; and "labor cost savings," under which it would reduce the wages and benefits payable to all of its employees, and to take other measures that it deemed necessary to reduce the personnel-related cost of providing service.

The Debtor's management and the Mercer analysts went through the Debtor's cost structure in that order, targeting individual line-entries of expenditure and reducing the projected amounts as much as they could consistent with maintaining the integrity and quality of a reduced operation based on a 49–Saab fleet. They turned to reducing labor costs only after extracting as much as they could out of the other three areas.[14]

When all of the other cost reductions were quantified and deducted from the anticipated revenues from a steady-state fleet, the Debtor's management concluded that $17,100,000.00 had to be cut from its labor costs per year, *after* the reduction in labor force that would be required by the retirement of half of its 2005–level fleet at Northwest's direction. Taking this figure as a numerator and the Debtor's aggregate labor costs after fleet reduction as the denominator ($89,700,000.00), the Debtor's management identified a 19.4% overall reduction in labor costs as the target for this "key area" in a restructuring.

They then made a policy determination that the several "labor groups" within the Debtor's workforce would all be subject to the same 19.4% reduction in costs. This was to include officers, directors, and all management personnel, as well as both unionized and non-unionized hourly employees. Recognizing that the structure of compensation differed between some of the labor groups, they planned for the same percentage cut in the total labor costs within each group but allocated the reduction differently among the existing components and determinants of compensation for each group. Those components included salary or hourly wages; performance-related incentive pay; and benefits such as medical and disability insurance coverage, sick time, and vacation accrual; and "work rules" under collective bargaining agreements, which directed the way in which

**13.** They based this assumption on the inevitability that Northwest would phase out the operation of the Avro regional jets over calendar year 2006, and Northwest's announcement that it would not follow through on the remainder of its commitment to place the 15 CRJs with the Debtor. By the mid-fall of 2005, the Debtor's management started to suspect that Northwest would place all of its future CRJ work for competing bids on another request for proposal ("RFP")—including

the flying previously committed to the Debtor under the Omnibus ASA.

**14.** The Debtor's witnesses consistently testified to that effect. None of the unions brought forward any evidence suggesting the feasibility of other or deeper cuts in costs not related to labor. Thus, the unions conceded this component range of facts to the Debtor; and no recapitulation of the evidence on them is necessary.

individual employees would accrue their compensation actually received.

It was decided to increase the share of medical insurance premiums paid by an individual employee, and to do so by an equal fraction for all employees.[15] That share was to go from 30% to 50%. Employees' entitlements to disability pay (short– and long-term) and sick pay were to be reduced.

Since management employees had been "incentivized" by having a substantial component of their compensation in the form of incentive pay based on annually-evaluated individual and company performance, the percentage cut to this entitlement was to be significantly greater than the percentage cut to their base salary rate. The percentage cut to the wages of hourly-paid union employees was to vary somewhat as between the unions, depending on the availability of other measures not directly related to wage rates that the Debtor's managers identified as ways to contribute to an overall 19.4% cost reduction for each union group.[16]

On various dates in late September and early October, Spanjers, as the Debtor's President, met with representatives from each union to advise them of the "dramatic fleet changes the [Debtor] was going to experience as a result of the Northwest bankruptcy" and to ask for the unions' cooperation in lowering expenses via consensual modifications to their collective bargaining agreements. After ensuing discussions between representatives of the Debtor and the unions did not significantly advance the issue, Spanjers used a November 21 letter to propose an "expedited negotiation schedule from November 29, 2005, to December 19, 2005," to reach consensual modifications that would "allow [the Debtor] to avoid a Section 1113 filing." In that letter, he gave notice to each of a separate meeting between the Debtor and each union, all to convene on November 29. These meetings were to kick off the negotiations, via an informal presentation of the Debtor's post-bankruptcy business plan and other materials in support of the proposals for modification that the Debtor would then make.

At the meeting, Spanjers explained the Debtor's business plan and made remarks to open a more structured discussion on the matter of voluntary concessions from the unions. After that, the Debtor sent to each union a first "Section 1113 Proposal Term Sheet." [17] Each of these documents contained a summary of terms under which the Debtor proposed to "restructure the current [collective bargaining] Agreement to enable the transformation of the Debtor consistent with the announced business plan" that had been presented at the November 29, 2005 meeting. All of them provided for a "new Agreement" with an effective date of April 1, 2006, and an "amendable date" of March 31, 2012.[18]

---

15. The only exception was to be the part-time customer service representatives, a non-unionized group with high historical turnover. The company-subsidized medical insurance benefits for this employee group were to be eliminated, and had been by the time of the hearing on this motion.

16. It is not necessary to get into the specific details of these differences at this point.

17. Specifically, the first term sheet to AMFA was dated December 6, 2005 [Exhibit No. 106]; the first to AFA was dated December 2, 2005 [Exhibit No. 207]; and the first to ALPA was dated December 5, 2005 [Exhibit No. 310].

18. Per the testimony of David Borer, AFA's General Counsel, collective bargaining agreements governed by the Railway Labor Act do not have a fixed term at the close of which they are extinguished in legal effectiveness. Rather, they identify a starting date and an "amendable date," after which the terms of the subject agreement may be consensually

These initial term sheets contain three or four pages of outlined content, plus more lengthy attachments with financial detail. As to all of the unions, the outlines summarized the Debtor's proposals to change terms that governed the amount of pay; "work rules" and staffing provisions that governed scheduling, duty assignments, and furlough and recall; and benefits, including sick leave, medical insurance, and the disability program. It also contained the Debtor's proposal to establish a profit-sharing plan for all employees. Finally, each proposal had additional provisions going to the types of employment terms that were unique to that union, greatest in number for the pilots who belonged to ALPA. These included the dismissal of certain pending grievances by individuals or groups, to which the Debtor assigned some savings value.

Each proposal contains supporting charts that summarize the valuations that the Debtor placed on each element of compensation under the collective bargaining agreements, and the savings it anticipated as to those elements it proposed for modification. These "costing sheets" are detailed. They set forth the projected costs of the several components of compensation for each union group over the six-year duration of the proposed concessions, with the values attached to each type of concession. The bottom line of each is the total of "Target Cost Savings" calculated via these projections for each union group for each year, as compared to the proposed valuations set forth in the earlier term sheets.

In conjunction with the presentation of the Debtor's business plan, these three documents did set forth a proposal for modification of each union's collective bargaining agreement that was sufficient to satisfy the first element identified in *American Provision Co.*[19]

### 2. Basis for Proposal in Most Complete and Reliable Information Then Available.

The debtor-in-possession must then establish that the proposal was "based on the most complete and reliable information available at the time of such proposal." 11 U.S.C. § 1113(b)(1)(A). The Debtor bears the initial burden of production of evidence on this element. *In re American Provision Co.*, 44 B.R. at 909–910.

"amended" via an involved and multi-sequenced process of negotiation pursuant to Section 6 of the Railway Labor Act. Borer termed the Section 6 process "interminable." He attested to it being a process of both sides opening with long "wish lists," and then going forward through a process of bluffing and "hide the ball," with each side largely blind of the other side's true economic position. In the meantime, the unamended terms of the agreement ("current book" in the parlance) continue to govern. Because the union gains the right to consider and call a strike only after consensual mediation and the declaration of an impasse in that process, it can take several years before amendments to an agreement under the Railway Labor Act are even reduced to final terms.

**19.** Since the dissemination of these first term sheets, the Debtor has proffered multiple iterations of a term sheet to each union, as a result of an ongoing process of data and document sharing, meeting, and negotiation. These new versions contain revisions of the Debtor's "ask" for concessions made in response to negotiation. Through the midpoint of the evidentiary hearing, the Debtor was up to a seventh variant of a proposal proffered to each union, most of the later ones being in response to counter-proposals that the unions started making after this motion was filed. The furnishing of the very first one, however, is sufficient to satisfy the threshold element—particularly because its signal characteristic, the 19.4% overall cut to labor costs and the corollary impact on individual employees' pocketbooks, was carried forward through all versions, including those proffered after the beginning of the hearing.

The Debtor based its initial proposals to its unions on a business plan dated December 2, 2005. This business plan projected the Debtor's operation over a term of 6.5 fiscal years, from the second half of fiscal year 2006 to the end of fiscal year 2012. The business plan was built on information gleaned from three major sources: the Omnibus ASA; the Debtor's actual budget for fiscal year 2006; and the projections of revenues and expenses that the Debtor's management and the Mercer consultants made on the basis of the Debtor's past operating experience and certain assumptions as to the parameters of the future operations.

Those assumptions were:

1. The Debtor would experience a 5% drop in any revenue that it continued to derive from flying for Northwest.

2. The Debtor would have to generate an 8% operating margin by fiscal year 2012, as a condition of receiving "exit financing" for the consummation of a Chapter 11 plan, for receiving future RJ flying for a network carrier, or both.

3. The Debtor would be successful in reducing costs via the operational and vendor restructuring and exercise of § 1110 rights that it had undertaken as a first resort, in the respective measures of 43%, 10%, and $7,700,000.00.

4. The Debtor would bring about the 19.4% overall labor cost reduction that it had calculated as part of the restructuring.

5. At minimum, by the beginning of its fiscal year 2008, the Debtor would be reduced to a "steady state" fleet of 49 Saab aircraft, flying for Northwest under terms equivalent to the provision for that fleet component under the Omnibus ASA but less the 5% rate increment noted earlier.

As such, the business plan was both a compilation of basic data and an analysis and projection of that data. For its presentation on its motion, the Debtor proffered the business plan and its source financial data as the "information" on which it based its first proposals to the unions, arguing that they were "the most complete and reliable ... available at the time of such proposal[s]."

In their original written objections, the unions did not expressly raise any challenge to the Debtor's showing on this requirement, articulated as such. In their post-hearing submissions, however, they framed an objection under this element. They premised this on three alleged shortcomings: the lack of alternate projections based upon a larger fleet size and broader scope of work, beyond that done with the 49–Saab fleet component; a lack of any expense line-entry for a future management fee payable to MAIR; and an alleged defect in the Debtor's assumptions as to the incidents of employee attrition after an imposition of wage and benefit cuts.

These complaints, however, are not relevant to the second element under *American Provision Co.* By the essence of the modifiers "complete and reliable," the second requirement goes to the comprehensiveness of the underlying factual support for a debtor's projections under § 1113(a)—its breadth, depth, and objective credibility. Clearly, the statute's idea is that a debtor-employer must make a proposal firmly grounded in the historical reality of operational economics, an unvarnished evaluation of its current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future, whether subject to the financial obligations of its collective bargaining

agreement(s) or not. The requirement essentially bars a debtor-in-possession from making a proposal that is cursory or arbitrary, or one whose specific terms are result-driven in isolation rather than process-derived and based on actual experience.

The three points that the unions raised post-hearing do not go directly and immediately to the breadth or completeness of the financial inputs for the Debtor's analysis. Rather, they go to the merits of three assumptions that structured the way that the Debtor treated the underlying source data in its analysis, once it was commenced. These points are relevant to the merits of this motion, but to a different statutory element. They do not go to whether the Debtor mustered a sufficiently comprehensive, detailed portrait of its financial posture and prospects before it formulated its proposals, and then used it in doing so.

Given that conclusion, it is not difficult to pass the Debtor on the second element under *American Provision Co.* All of the evidence reflects that the Debtor's management and the Mercer professionals assembled data on past operations that was accurate in its detail and content, and that was up-to-date as of early December, 2005. The Debtor used the only contractual structure for future business that had any conceivable utility as things stood then— the remaining component of the Omnibus ASA that Northwest had not yet repudiated by action.

Taking each of the factors of *American Provision Co.* in its own right, it is most appropriate to use each one as a *successive* modifier of the first. Considering the early December, 2005 proposals in their own right, it is clear that they were based upon the most complete and reliable information available to the Debtor at that time. The unions have not challenged the reliability of any of the raw source data via evidence that is directly probative. The Debtor had relied on the historical data itself, since it came from its own books. Nor have the unions suggested any other sort of information *that the Debtor should have considered* when it formulated its proposal.

Thus, the Debtor has satisfied the second hurdle of *American Provision Co.* Whatever the vulnerability of the proposals on the matter of the three aspects raised by the unions through this element, it will be as a function of whether the proposed cuts are "necessary" to the Debtor's survival as a reorganized and viable going concern, or whether the modifications are part of a reconfiguration of all constituencies that is fair and equitable to all.

5. *Provision of Relevant Information to the Unions to Enable Their Evaluation.*

■ The next procedurally-oriented requirement under *American Provision Co.* is the fifth in its enumeration. After the Debtor made its proposals to its unions, it was required to provide them "with such relevant information as [was] necessary to evaluate the proposal[s]." 11 U.S.C. § 1113(b)(1)(B). As to this element, the Debtor bore the initial burden of production, as to "what information it [had] provided." Then the burden shifted to the unions, "to provide evidence that the information provided was *not* the relevant information which was *necessary* for [them] to evaluate the proposal[s]." *In re American Provision Co.*, 44 B.R. at 909–910 (emphasis added).

The prefatory language of § 1113(b)(1) requires a debtor-in-possession to do this *"prior to filing* an application seeking rejection of a collective bargaining agreement ..." (emphasis added). Congress's purpose in creating such procedural prerequisites on top of substantive elements

was to ensure that labor law's substratum—the protection and encouragement of a *process* of collective bargaining—would have one last meaningful chance before a debtor-in-possession could resort to the bankruptcy-law remedy of rejection. *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 989 (2nd Cir.1990) (as to concession sought as part of restructuring in bankruptcy, debtor must "attempt to negotiate with the union prior to seeking to terminate a collective bargaining agreement ..."). *See also* 130 CONG. REC. S8898 (daily ed. June 29, 1984) (statement of Sen. Packwood: § 1113 was enacted to "stimulate collective bargaining and limit the number of cases when a judge will have to authorize the rejection of a labor contract"; requirements of § 1113 "place[ ] the primary focus on the private collective bargaining process and not in the courts ...").

 In a very general sense, "the debtor must provide to the union enough information to justify *each* of its proposed modifications." *In re K & B Mounting, Inc.,* 50 B.R. 460, 467–468 (Bankr.N.D.Ind. 1985) (emphasis added). Another court has observed that the debtor must provide "the most meaningful financial and statistical information available." *In re Liberty Cab & Limousine Co., Inc.,* 194 B.R. 770, 777 (Bankr.E.D.Pa.1996). In a more specific sense, providing cost analyses for the proposed modifications, financial statements for the debtor, tax returns, and other related information may be sufficient. *In re Bowen Enters., Inc.,* 196 B.R. 734, 741 (Bankr.W.D.Pa.1996).

 Clearly, the breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing. *Compare In re Bowen Enters., Inc.,* 196 B.R. at 741; *In re Appletree Markets, Inc.,* 155 B.R. at 438 (debtor that "opened its books" to union and made other "information" available during preliminary § 1113 bargaining process satisfied requirement); and *In re Big Sky Transp. Co.,* 104 B.R. 333, 335 (Bankr. D.Mont.1989) (supplying debtor's "financial data and business plans" was sufficient), *with In re Valley Steel Prods. Co., Inc.,* 142 B.R. 337, 338 (Bankr.E.D.Mo. 1992) (provision of yearly operating statements and monthly operating reports for bankruptcy case sufficient), and *In re Royal Composing Room, Inc.,* 62 B.R. 403, 412–413 (Bankr.S.D.N.Y.1986) (provision of single sheet of paper with summary of debtor's revenue and expenses was sufficient).

 The debtor in this case is engaged in a large, complex, and interrelated industry governed in all directions by contract, regulation, and collective bargaining agreement. Thus, in general, far more information is called for to satisfy the fifth requirement, rather than less.[20] The real question is what sort of information is to be provided in this greater amount, and of what character.

 Given the underlying purpose of promoting pre-motion bargaining, the information to be provided is not "relevant" merely by its objective, empirical charac-

---

**20.** In argument on and off the record, the Debtor's labor counsel kept referring to the holding of *Royal Composing Room* as the basis for a *de minimis* requirement, virtually as a mantra intoned against the unions' demands for several very specific founts of information. Given the universe of difference between that debtor's situation and posture and this one's, the insistence was puzzling—not to mention increasingly tiresome.

ter alone. If the statute is to operate as intended, the provision of the information has an additional function, dovetailing into the broader congressional purpose of fostering consensual resolution before presentation to the court. That is to enable a union's representatives and members to subjectively attach some bedrock legitimacy to a debtor's proposal—to convince them that the process of formulating the proposal was not arbitrary, not "loaded" toward a particular result, not manipulated to produce an unfair allocation of burdens among the constituencies to the bankruptcy case. This aspect is more diffuse than the financial import of the facial content of the documentation that a debtor may provide under § 1113(b)(1)(B). However, it is no less vital.[21]

 It is here that the unions' major cavil with the Debtor's production of information has its context. After it went into Chapter 11, the Debtor reengaged Mercer Management to create a digital tool to enable it to do a financial forecast for its post-bankruptcy operations under the fleet configuration that its management considered to be the irreducible base for a restructuring in Chapter 11. This effort resulted in the so-called post-petition "Mercer Model" noted *supra* at n. 11, p. ——, a built-out spreadsheet that used the Debtor's budget for fiscal year 2006 as a start and received financial input to cascade it through the various incidents of operation over a period of future years. The output would be income, balance, and cash-flow statements for an airline operation of a specific fleet configuration.

These documents would show future bottom-line financial results that would vary depending upon the amounts of revenue and expense that were input into the categories.

As constructed to produce the December 2, 2005 financial overview, the Mercer Model would forecast for a fleet of 49 Saab turbo-prop aircraft. This more "dynamic" version had some capacity to generate overview projections for other fleet configurations, but this output would not be reliable; the lack of matching formulas in the hard-coding structure of the spreadsheet could throw off the cascading process. A minimum of two weeks of concentrated programming would be necessary to ensure accuracy for analysis of any fleet scenario other than the Debtor's steady-state 49–Saab configuration. This version of the Mercer Model retained "artifacts" from the static pre-petition model on which it was constructed, the incomplete beginnings of a framework for other functions, and it lacked the full architecture to properly "cascade" input data through a different set of assumed configurations.

After the early December, 2005 presentations to the unions, union representatives repeatedly requested that the Debtor provide them with a "live" working digital-format copy of the Mercer Model, as part of the information they wanted in connection with the "pre–1113 bargaining." As repeatedly, the Debtor and its representatives refused to turn over a copy of the program, during the time relevant to the consideration of this motion.[22]

---

**21.** And, at rock-bottom, it is just prudent for a debtor to let this end guide its information provision as a tactical matter—if it really wants to resolve the issue of concessions as quickly and inexpensively as possible.

**22.** It was not until more than a week after the hearing on this motion finally adjourned, that the Debtor gave copies of the Mercer Model

to the unions and sent over personnel to demonstrate its operation. Strictly speaking, this point is not reflected by the record for this motion, having emerged at a post-hearing status conference. However, the evidence does reflect that the Debtor had not yet given the access as of the final day of the long hearing on this motion.

The Debtor's stated reason varied with the identity of the witness who testified to this point. Steven Black, the Mercer consultant who participated in the creation of the post-petition model, established the model's lack of reliability in application to other fleet configurations, and without controversion from the unions. Hien Cao, the Debtor's Director of Strategic Planning, cited the possibility of "very erroneous results," "unless you know exactly how to input," as the reason why the Debtor would not release the Mercer Model outside its control. He (as well as Black) alluded as well that refinements were being made to the model almost constantly during the winter months of 2005–2006, though he did not cite this directly as a reason for not acceding to the unions' request. Under cross-examination, Thomas Schmidt, the Debtor's Vice President of Finance, cited a proprietary character of the input data as the reason for not giving the access, though he could not opine as to whether the infrastructure of the programming was proprietary to Mercer. Ultimately, Schmidt attributed the Debtor's refusal to the fact that the provision of the model would have been "distracting" to the pre-motion negotiations, given the limited time available for them.

With the evidence of the Debtor's justifications as much over the map as it was, it is hard to make a finding on the issue. In the last instance, however, no version is adequate—and the Debtor's case on the fifth element fails because it withheld the Mercer Model.

The reason is contained in the testimony of two witnesses for AFA, David Borer, its General Counsel, and Daniel Akins, its expert witness on the valuation of the Debtor's proposal and various procedural issues. Borer testified very credibly to the AFA's experience in "maybe a dozen" pre-motion and post-hearing negotiations with debtors-in-possession under § 1113, including "three or four" with regional airlines. He noted that in every other case with which he had been involved, the airline-debtor had provided AFA with both its business plan and a working version of its software model for projections, to enable AFA to see how it had "costed" the concessions it was asking. This included the recent case of United Airlines, where that debtor's consultants had given "eventually nine or ten different versions" of its so-called "Gershwin Model," "spectacularly detailed" and in continual updating throughout the case.

Borer testified that in this case, and in particular on the matter of the Mercer Model, the Debtor had been "completely opaque." He stated that this was outside his experience in all other cases under § 1113. He contrasted this case, which was then deep into a several-week evidentiary hearing on the Debtor's motion, with all of the other cases in which AFA came to an agreement with the carriers as to permanent concessions that it would give. In those cases, Borer testified, the concessions granted by AFA "usually [were] ... 100% of the company's ask," almost always made before an evidentiary hearing commenced. Borer attributed this difference to the fact that AFA's negotiators had not been able to content themselves on the value of what the Debtor was asking AFA to give up. And that, he said, was due in large part to the lack of a working copy of the Debtor's model through which they could test the soundness of the methodology.

Akins similarly testified that he had requested access to the dynamic Mercer Model to test the Debtor's methodology on its costing for a 49-Saab fleet, as well as any utility the model might have to the costing of "expansion scenarios." He too stated that he had been given comparable

access in prior Chapter 11 cases of other airlines, and had found that essential to advising AFA in order to successfully conclude negotiation under § 1113.

The Debtor had no real evidentiary response to this showing. Clearly, these two witnesses' testimony reflect a "legal culture" that has evolved for the treatment of this issue, as airline reorganization cases have proliferated and as the application of § 1113 within them has bloomed. This development has not occurred in a vacuum, nor as an evolutionary "sport." Rather, as Borer's uncontroverted testimony establishes, it has spread because of its very utility to the negotiation of these complex disputes. In turn, that utility is borne out by the fact that most all of those disputes have been resolved in a way that promoted the survival of the airline-employer.

The provision of an airline's dynamic model might be considered as part of a custom and usage peculiar to proceedings under § 1113, or it might be measured as a matter of causality in fact, against a record of past effectiveness. In either case, this industry-wide experience establishes such a model as *"relevant* information as is *necessary* to evaluate" an employer's proposal for concessions from a union. Thus, the Debtor's failure to provide it to its unions, which could have been done under reasonable controls and under appropriate circumstances,[23] means that

the Debtor did not provide the information to them that the fifth *American Provision Co.* element required it to do before it brought this motion.

The unions raised other contentions with the Debtor's pre-motion provision of information to them. None of them are as weighty as the one just treated, but they should be addressed.

The first is that the Debtor did not provide the unions with either the RFP for CRJ flying that Northwest issued in December, 2005, or the Debtor's response to it, before the Debtor filed its motion. The RFP itself was issued on December 9, 2005, a few days *after* the Debtor presented its first proposal to the unions. The Debtor submitted its initial bid to Northwest on January 17, 2006, and amended that on January 31, 2006. The Debtor cannot be faulted, then, for not turning over anything from its response before it actually made it. After that, the Debtor's management was justified in insisting on the highest level of protection for the confidentiality of the response. As things turned out, the Debtor was and still is in pitched competition to win back this work from Northwest. In all, eight bids came in on the RFP. It was utterly clear that Northwest was going to be extremely demanding of the winner. The Debtor's competitors would certainly have welcomed any leak of any portion of its pro-

---

23. There is, of course, the matter of the post-petition model's "artifacts" possibly creating digital pathways for flawed inputs, or even creating a fractured foundation from which the unions' consultants could have mounted a skewed challenge envisioning alternate fleet scenarios. One way or another, the Debtor could have dealt with these possibilities. A careful orientation to the model's limitations during an on-site introduction, and preserving the content of that presentation for possible evidentiary use, would have been the key. Yes, such an effort would have cost time and money, when the Debtor's resources were already far stretched over a multi-front battle for survival. And, yes, this could have become especially burdensome had the unions gone ahead to try to exploit the model in support of their own cases despite all its flaws, with the Debtor having to counter any misleading results. Nonetheless, it seems that airline-debtors in other cases have assumed comparable risks, and somehow come to the resolution of their issues under § 1113. As it was, the strategic election here *really* did not play out, insofar as this one element of § 1113 went.

posal. This could have put the Debtor out of the running. Further, the Debtor's management was well-founded in insisting on something more than the unions' proffer, the execution of a confidentiality agreement by one or more individual persons. The bid could have passed through many, many hands on the unions' side in the course of pre-motion bargaining. There would have been no way at all to account for physical possession or transmission and dissemination of the content under the governance of a confidentiality agreement executed by any initial or later recipient of the bid.[24]

In short, the Debtor did not fail the obligation of production under the fifth element in the way it handled this information.

Beyond the two areas just discussed, AMFA raised three specific requests for information on which it said the Debtor failed the production requirement. All of these were identified in testimony by Kevin Wildermuth, the chair of AMFA's local negotiating committee:

1. *A calculation of the Debtor's operating margins for each aircraft-model component of its fleet, for the preceding three years:* The Debtor prevails on this item. Given the flux of contemporaneous events, and the ongoing changes in the Debtor's fleet composition, this information simply was not relevant. It was indisputable that the Debtor was to lose the Avro component within one calendar year. The Debtor fully expected an even more aggressive Northwest to shift the ground under the Saab operation, if it even left that work with the Debtor. Certainly, all bets were off as to whether

three months of operating experience with only two CRJs had anything to do with what Northwest would fix for a permissible recovery of profit on the post-petition award of business for that sort of flying. Besides, AMFA did not establish that the Debtor had already done the analysis to produce this specific information. Section 1113(b)(1)(B) cannot be read to mandate a debtor's performance of further analysis on existing source data; it only compels the disclosure of that data and any previously-performed analysis. Finally, it is entirely possible that the basic data on this issue, and possibly even the requested analysis, could have been gleaned from the 30-months' worth of Monthly Performance Reports that the Debtor did release to the unions. These are internal documents generated only for the highest levels of the Debtor's management that the Debtor turned over to the unions as a part of the pre-motion disclosure.

2. *Line-item breakdown of management incentives/"bonuses":* Wildermuth did not elaborate on what he meant by this phrase. If he was referring to a breakdown by individual management employee, as to such a person's past and anticipated receipts from the Debtor's several incentive compensation programs, that simply would not have been relevant. The Debtor's proposal was to inflict the same degree of cut by percentage on each employee *group,* including all managers, under its theory of the fairness and equity requirement of § 1113(b)(1)(A). A

---

**24.** As the unions continued to push the issue, the vehicle of a universally-applicable court order mandating confidentiality was eventually used—on February 24, 2006, when the hearing on this motion started. The unions received the response to the RFP after that.

breakdown by individual, named employee would have service only in a very "personalized" discussion of the equity of burdens under the Debtor's proposal. That might be something to resonate with employees' feelings of personal betrayal, but it would only serve as an inflammatory distraction from the truly difficult issues of a dispute under § 1113.

3. *Financial assessment of impact of work stoppage resulting from imposed terms:* Wildermuth asked the Debtor to provide him with the results of any financial analysis the Debtor had done in contemplation of its unions striking, were it to prevail on this motion and to impose its proposed cuts unilaterally. The Debtor's response was that it had not performed such an analysis. During the hearing, AMFA did not develop any evidence that the Debtor had. Thus, because the Debtor could not produce nonexistent financial information, it is unclear why this issue persisted in AMFA's objection.

This is the sum of the unions' other specific complaints about pre-motion provision of information. None of them gives additional grounds to hold against the Debtor on its showing under the fifth element, though the Debtor did fail on the matter of providing the Mercer Model.

### 6. Meeting with the Union(s) at Reasonable Times.

 The sixth-numbered element under *American Provision Co.* gets down to the actual convening of the pre-motion bargaining that the statute promotes. It requires the debtor-in-possession to set up that very process: "Between the time of the making of the proposal and the time of the hearing [on the motion under § 1113], the debtor must meet at reasonable times

with the Union." *In re American Provision Co.*, 44 B.R. at 909. The debtor bears the initial burden of production on this element. *Id.*

At the outset, it should be observed: this requirement only goes to the *fact* of the meeting(s) taking place, and the reasonableness of the arrangements. It does not go to what actually transpires at the meeting(s), that being the province of the seventh element under *American Provision Co.*

The unions' post-hearing submission on this element was so short as to amount to a full concession to the Debtor. For the record, though, it must be said, and with some backup, that the Debtor has met it.

Before the Debtor made its first formal proposal to each union in the first week of December, 2005, its representatives met with representatives of each union to communicate its request for voluntary concessions on the wage and benefit terms, and to share a general review of the Debtor's status in bankruptcy and its financial situation. Then, over a stretch of eight weeks in December, 2005 and January, 2006, the Debtor set up and conducted bargaining sessions with AMFA (10 formal meetings, consuming approximately 20 hours), AFA (14 formal meetings, again consuming approximately 20 hours), and ALPA (20 formal meetings, consuming approximately 35 hours). With each of these unions, the Debtor aired its first five successive proposals via detailed term sheets, and the parties discussed them.

Needless to say, the strings of meetings did not result in a comprehensive accord with any of the three unions. Nonetheless, in terms of their timing and length, these meetings were reasonably arranged. By initiating and conducting them, the Debtor staged a pre-motion bargaining process and structure that satisfied its

sixth requirement under *American Provision Co.*

### 7. Conferring in Good Faith Toward Mutually Satisfactory Modifications.

 *American Provision Co.'s* seventh requirement goes to the strategy and conduct of a debtor-in-possession *during* premotion negotiations. The Debtor is required to show that it "confer[red] in good faith in attempting to reach mutually satisfactory modifications of [the collective bargaining] agreement." 11 U.S.C. § 1113(b)(2). Assuming that a debtor has satisfied the sixth requirement, the burden of production on this seventh element shifts to its union(s). "It is incumbent on the union to produce evidence that the debtor did not confer in good faith." *In re American Provision Co.*, 44 B.R. at 910 (emphasis added).

 In evidence and post-hearing submission, the Debtor's unions have cited multiple circumstances and actions that they characterize as badges of the Debtor's overt bad faith in pre-motion bargaining. A couple of these go to very fundamental aspects of the Debtor's stance throughout the process; others go to particular issues or tactics, sometimes to only one or two of the unions. All of these points must be weighed as to whether they evidence a lack of good faith on the Debtor's part. As one court succinctly and nicely put it, "[g]ood faith bargaining is conduct indicating an honest purpose to arrive at an agreement as a result of the bargaining process." *In re Walway Co.*, 69 B.R. 967, 973 (Bankr.E.D.Mich.1987).

It is most appropriate to rule first on the unions' points that go to various aspects of the Debtor's *style* in conducting the bargaining, particularly actions it took in structuring its proposal and then dealing with the unions' contentions.

 The first such is the complaint that the Debtor had "the same persons who [were] litigating the Section 1113 motion simultaneously serving as the company's negotiators at the bargaining table."

ALPA raised this issue. Its witnesses danced around the real point in their testimony. However, remarks by the unions' counsel both on and off the record suggested that their problem was with the Debtor's election to use *the same individual attorneys,* from the law firm that served as its special labor counsel, to handle both the extensive discovery preparation and in-court trial work on the motion itself, and to appear on the Debtor's behalf in both pre-motion bargaining and the negotiation sessions that the parties continued to hold after the motion was filed and on off-days during the pendency of the hearing.

Bruce York, ALPA's Director of Representation, testified that this was "very unusual," even for a small airline in Chapter 11. Captain Mark Nagel testified to what could be called an "emotional overhang" that he thought had made productive negotiations very difficult, when an attorney who had been sharply questioning and confronting union members in deposition or on the witness stand then sat across the bargaining table from those same persons a day or a week later.

As intangible and slippery as this consideration is, one can see the point. But, though the practical wisdom of this staffing practice can be questioned, and its ultimate efficacy for successful bargaining is probably low, it cannot be branded as a deliberate tactic to inflame union representatives in bargaining or to derail negotiations. At best, it was an election flawed in its conception, most likely prompted by a particular notion of economy for the bankruptcy estate and the limitations on the

availability of enough personnel to serve all functions in a very intense process.[25]

■ Second, ALPA cites a number of instances when the Debtor simply withdrew particular components of its proposal for modifications, taking them off later term sheets, and refused to further discuss them as potential cost-saving measures, after the unions had raised strong objections to them and suggested significant revisions. (The ones cited were those that went to systems for pilot assignment, training, and the like, and the possible withdrawal of pending individual and group grievances.) The insinuation here is that the Debtor was whipsawing the unions, forcing the investment of resources into responding to issues that it was not really serious about in the first place.

The Debtor's response to this issue is credible, and it defuses the matter as a badge of bad faith. The Debtor opened negotiations on December 5, 2005. However, ALPA did not make a comprehensive counterproposal until January 3, 2006, nearly a month later. That counterproposal did not cover the range of issues that the Debtor had raised, suggested only *interim* relief, and was not directly or immediately responsive to the Debtor's insistence that it needed historically-unprecedented cost containment or it would not survive as a going concern. The Debtor was not out of bounds in concluding that these issues were not central to its goal in commencing the § 1113 process, or when it perceived ALPA as concentrating on those matters to the exclusion of the central issues. Taking them off the table as a means to force more focus did not evidence a lack of good faith.[26]

■ A third point, commented on by witnesses for ALPA and AFA, was that the Debtor started by casting its target labor cost reduction as a percentage of payroll expense, rather than as an absolute dollar-amount like other airline-debtors had previously done in their experience. This was about all that Borer and York said, trying to project a sense of being very non-plussed at an effrontery. Without more context than that, it is difficult to see the point. There is no detail to establish that the quantification more in the comfort of their past experience would be more comprehensible or useful to the unions. The Debtor ended up quantifying the cuts to specific dollar-amounts for each labor group anyway.

And the bigger picture, in a case that is unique or near-unique in its business configuration, furnishes the rationale. As a regional carrier under contract with only one network carrier when it went into Chapter 11, the Debtor was already boxed in on many options for restructuring toward profitability. It lacked control over nearly all of the pricing and distribution variables that most businesses have. It was right in the brunt of an externally-imposed downsizing. It was potentially vulnerable to further reduction in business volume. And it was possibly to be deprived of *all* revenue. This left its man-

---

**25.** The Debtor's special labor counsel indicated something to that effect, at least in chambers.

**26.** Though ALPA's witnesses did not articulate it as such, one suspects that the unions' reaction to this came more out of a mind-set couched on "Section 6" bargaining under the Railway Labor Act. There, it seems, no single

issue can ever really be allowed to die until painstakingly resolved, and perhaps not improperly so. As high-level witness-employees for both ALPA and AFA acknowledged in testimony, however, the process under § 1113 is a very different thing, with a very different dynamic and one much more compressed in time.

agement and bankruptcy counsel not knowing any firm boundaries for the income and expenses that it would be dealing with eventually. Given that, fixing the target labor cost reduction by a percentage of the existing cost was not only not arbitrary, it was the only meaningful factor that could give the Debtor some flexibility in a situation that boded to be in flux for an unknown time.

■ Fourth, the unions take the Debtor to task for forcing the issue of modification through § 1113 before the Debtor had any assurance of retaining any flying for Northwest, and in particular before Northwest had made an award under the December, 2005 RFP for CRJ flying. Building out to the side from this point, the unions also complain that the Debtor structured its bid under that RFP by assuming the 19.4% reduction in labor costs that it would be seeking from its unions, long before any consensual modification or court-permitted imposition of cuts. This, they maintained, "effectively presented the Unions with a *fait accompli*, and . . . precluded good faith negotiations."

As the root for this objection, York and Borer both testified to their unions' experience in past Chapter 11 cases where an airline's ultimate business volume was still uncertain due to the possibility of a bidding process or other factor that prevented a reliable long-term business plan. In those cases, the unions stated, the debtors agreed to "contingencies in their proposals or . . . interim deals to delay bargaining until their business plans [had] greater certainty."

To some extent that argument spills over into the merits, as to the necessity of the depth of the proposed cuts. However, to the extent that all this goes to the good faith of pushing the issue under § 1113 when it was pushed, the argument fails to recognize the peculiarities (or even the near-uniqueness) of the Debtor's situation just two months into the case. It was having half its fleet stripped from it, with a like fraction of its financial means for survival. Northwest gave every semblance of being implacable in its own drive toward economy, and there was nothing to refute that.[27] Yet Northwest presented the only conceivable avenue for the Debtor's mid-range survival, even on a diminished basis, by the prospect of retaining the "core" Saab flying or by retaking the CRJ work under terms different from the Omnibus ASA. It was clear enough by November, 2005 that the Debtor would have a struggle to retain even a "steady-state" fleet. Both of these work components were overtly in play when the Debtor got the pre-motion process under way in early December. The Debtor's management, its consultants, and its bankruptcy counsel all concluded that the only chance of retaining and rebuilding lay in projecting greatly-reduced costs; and the Debtor had to apply that projection right away, in its response to the Northwest RFP.

All the circumstances—in particular the utterly cold and distanced way in which Northwest presented itself to the Debtor—dictated that the Debtor go ahead with the modification process right away. Its management reasonably believed that it had no chance of maintaining competi-

---

**27.** Among other things—and it is time to formally make this observation for the record— Northwest was under its own fiduciary obligation under Chapter 11, to minimize expenses in order to maximize the ultimate return to its own creditors. Call it a situation of "dueling debtors," if you will, but the cir-

cumstance of having both a network carrier and a non-subsidiary regional partner being simultaneously in Chapter 11 but in unrelated cases in different courts is probably unprecedented in the history of airline bankruptcy in the United States.

tiveness for the Northwest work if it did not rely on an ability to effect the reductions, and if it did not build them into its pitches to Northwest. Intervening events in Northwest's RFP process have borne this out.[28] Terming what the Debtor did as a *fait accompli* is a florid bit of rhetoric. Under the circumstances, there was nothing else the Debtor could have done; and, if it ends up not being able to deliver to Northwest on such terms if it wins the bidding, the CRJ work will likely vanish.[29]

So, simply stated, the Debtor had no time to lose, and the circumstances gave no warrant to soften the brunt of the issue by delaying its raising with the unions. The Debtor did not lack good faith in pushing the matter of modifications to the collective bargaining agreements forward when it did, in relation to the incipience and pendency of the Northwest CRJ RFP or the prospect that Northwest would then push for concessions on the pricing of continued Saab flying by the Debtor.

The unions' ultimate suggestion is that in light of the contemporaneous uncertainties the Debtor should have fashioned contingencies into its proposals to them—automatic "snap-backs" to previous rates and conditions, the reopening of bargaining, etc. This vaults even further into the merits of the proposal as made. Discussing that at length in this procedurally-oriented context would jump the gun on these issues, situated as they are far more centrally to the unions' challenge to the Debtor. However, given the outcome on the substantive aspect, treated *infra* at pps. 742 – 743, it is enough to say that the Debtor did not lack good faith in its proposal and bargaining in this regard either.

AMFA raises the fifth style-and-process issue, on considerations that are mostly unique to it.

Alone out of the three unions, AMFA's collective bargaining agreement with the Debtor had become "amendable" under the Railway Labor Act in 2003. The two parties had engaged in sporadic rounds of "Section 6" bargaining after that. This process had not resulted in any overall recasting of the terms of AMFA's 1999 collective bargaining agreement. However, the parties had reached tentative agreement on a number of component issues, by the time the Debtor had filed for Chapter 11.

When the Debtor made its first post-petition overture to AMFA under § 1113, it withdrew its consent to those terms that the parties had tentatively settled in the Section 6 process. However, when it made its first formal proposal to AMFA under § 1113, it included a cost value assessed to the subject matter of these terms. AMFA takes exception to this, terming the Debtor's about-face to be a badge of bad faith.

Perhaps some umbrage is appropriately taken. However, the Debtor's seeming insouciance does not rise to the level of bad faith. The Section 6 negotiations did *not* result in a legally-enforceable full recast-

---

**28.** The testimony and exhibits on the specifics of the Debtor's participation in the CRJ bidding process are under seal, due to their extraordinary sensitivity and the gravity of the subject matter to the Debtor's very survival. Thus, not much can be said about this topic. In sum, though, it safely can be observed that eight bidders are indeed vying for Northwest's favor; Northwest is giving the Debtor no advantage in its considerations; and at the time when the evidence was submitted all parties in the process had a way to go in refining their bids before Northwest would bestow its favor. *See* discussion *infra* at pps. 735 – 736.

**29.** See further discussion on the merits of this, *infra* at pps. 732 – 736.

ing of the AMFA collective bargaining agreement. There is no evidence that the Debtor and AMFA had ever effectuated any of the component modifications before the Debtor's bankruptcy filing. Thus, though the Debtor appeared cheeky by pushing away and then pulling back the products of the Section 6 process, there was nothing legally or contractually untoward in what it did with them in the § 1113 process.[30]

▮ The unions' sixth charge against the Debtor's case for good faith is broader: that the Debtor set "false deadlines" for the unions to come to a consensual resolution. The insinuation here is that the Debtor hoped to undercut the unions' ability to meet a full defense of their constituents' interests, by creating a semblance of dire emergency in accelerating the issues to a formal resolution in court under § 1113.

The sweep of the evidence belies this accusation. To be sure, when the Debtor opened the formal pre-motion process in very early December, 2005, it demanded that the parties complete negotiations by December 19. The chances of that happening were close to nil, given the number of issues, the freshness of the process, and the complexity of the backdrop. However, it was not out of line to do something to crack the front that the unions had presented up to that point—what the Debtor characterizes as a failure to acknowledge the utter urgency of the need to substantially cut costs. It is not necessary to find that the unions blunted the subject of discussion before December 5, 2005 to peripheral matters not related to the hard questions of wage and benefit cuts. But there certainly is evidence in the record to that effect.[31]

The more weighty issue is the Debtor's timing of the § 1113 process in the overall context of this case. The Debtor first broached the issue of modifications to the collective bargaining agreements on an informal basis very early after filing for Chapter 11. It started the formal pre-motion process before the two-month anniversary of the filing. When the Debtor requested a "procedures order" for this motion,[32] its counsel urged that the Debtor had to "book" labor cost reductions by the March 31, 2006 end of its fiscal year, to be effective on April 1, 2006. That was represented to be an utter necessity, whether the reductions were obtained consensually or were imposed after a court-authorized rejection of the collective bargaining agreements.

The rationale for this timeline was the perceived need to finalize a cost structure

---

30. On this one, it is hard to see AMFA's point. If the partial and admittedly-tentative resolutions under Section 6 had not already reduced AMFA-related labor costs for the Debtor, they were not part of a reduced cost-base that would have compelled a smaller cut to AMFA's interests in the end. And if the Debtor had not suggested crediting these matters against the overall cut attributable to AMFA under § 1113, it would have had to go more deeply into other line-items to get to the 19.4% cut that it sought. Between these two parties there is no monopoly on accusations of being jerked around for years; it is only a distraction to make the charge on one component matter.

31. And, there would be no moral opprobrium to be attached to the unions through such a finding. It is simple human nature to turn away from gross unpleasantness when one does not yet feel it in one's gut as a dire threat. Nonetheless, the Debtor was not out of bounds in trying to force focus in this way, any more than it was by the issue-trimming discussed earlier. At rock-bottom, there was certainly no prejudice to the unions in the fixing of the December 19 deadline. And, in a fairly clear way, it did start redirecting the union representatives' attentions.

32. This was to be essentially a scheduling order under 11 U.S.C. § 105(d).

before Northwest took action on the CRJ RFP and the matter of continued Saab flying, and in time to enable the negotiation of final terms on the debtor-in-possession financing that the Debtor was then pursuing. The Debtor admitted that this would entail a very rapid clip for a complex legal matter. However, it maintained that any longer time in litigation would substantially increase the Debtor's risk on the two undertakings, i.e., that Northwest or a DIP lender would lose confidence in the Debtor's ability to provide and perform on the transactions, and they then would decline to do further business with the Debtor. Over strong objection from the unions' counsel, the Court agreed with the Debtor and set a schedule for the motion that contemplated a full submission for decision in time for the rendering of decision before March 31.

As the unions now point out, nothing had happened on either of the backdrop transactions when the record was closed on this motion in late March; even by mid-January, the Debtor's projected "cash-negative date" had gone further out in time; and in late March Northwest had not yet made an award on the CRJ RFP and was still very much in the process of evaluating bids and prodding bidders.

The unions and their counsel complained that they had been run rough-shod and bruised in this process, and there is some

basis for that. The cause for their complaint, however, really lies with the dire straits the Debtor was in generally, and in particular in the multi-natured hammerlock that Northwest held and was exercising over the Debtor's operations and future. There is no direct evidence that the Debtor's management or counsel advocated the expedited schedule as a ploy, to deprive the unions of a fair opportunity to either negotiate or litigate or to put them under undue pressure to make concessions. The circumstantial evidence cuts to the opposite effect, as does the direct evidence the Debtor proffered: *at the time,* and under their limited knowledge of either Northwest's or MAIR's ultimate aims,[33] the Debtor's management and counsel believed in good faith that bringing the issue of labor cost reductions to a full head by April 1, 2006, was the best way to stabilize the Debtor's position for the next steps of securing the Northwest business, seeking other regional-flying arrangements, and obtaining needed capital.

Intervening events, or the lack of them, have undercut the utter urgency of the April 1 date that seemed so compelling in mid-winter. However, very nearly all of those were not directly or strongly under the Debtor's control.[34] So the Debtor was not out of line in pushing the matter ahead as quickly as it did, as the circumstances

**33.** Early in the case, MAIR had made a show of interest in granting DIP financing to the Debtor. Its proffer was the basis for the motion under 11 U.S.C. § 363 that the Debtor filed on October 13, 2005, though the Debtor was actively investigating other possible lenders.

**34.** We have the ongoing indeterminacy of Northwest's bidding process, noted earlier, as well as the fact that MAIR withdrew its offer to provide DIP financing after the record was closed on the motion at bar. Another factor was internal to the process of the litigation, the stretching of the length of the

evidentiary hearing from the "five days or so" originally forecast by counsel to a span of 15 separate days in court. This required the parties to stipulate to an extension of the Court's deadline for the rendering of decision, which otherwise would have fallen on March 26, 2006, only a few days after the record was completed. Much of the added court time was consumed by the unions' counsel's cross-examination of the Debtor's witnesses—which usually was very, very lengthy, cumbersome, even arduous ... and mostly not illuminating.

then known to it suggested enough of a chance that disaster could result in late spring or early summer if the Debtor maintained its pre-petition level of labor costs throughout the case.

And, though the unions do not have to prove actual and resultant prejudice as a part of their initial burden on a lack of good faith, they have not done so. All of them mustered enough resources to meet with the Debtor throughout the pre-motion period, and to evaluate the Debtor's successive proposals to the point of preparing responses and alternatives.[35] The failure of the pre-motion process to generate consensual modifications is far more due to the persistence of the parties' stalemate on the issue of the general 19.4% reduction and a six-year duration for the reduced terms, than it is to any curtailment of an open-ended time to meet and bargain.

■ That loops back around to the unions' contentions with the three major substantive aspects of the Debtor's proposal, which characterized all pre-motion versions of the proposal: the overall cut to labor costs of 19.4%, the six-year duration, and a structure that did not envision reversal or amelioration of the cuts for any change in the Debtor's circumstances during the six years. The unions' complaint is that the Debtor opened the pre-motion bargaining with an offer structured on these three fundaments, and closed the process with the same, without giving a point, a minute, or an inch on any of them. Characterizing this as a "take-it-or-leave-it" attitude, the unions deny that the Debtor was even "bargaining" in light of its inflexibility, let alone bargaining in good faith.

The Debtor's response is that it was required by law and fact to open with a proposal that was "first-and-last" on these framing characteristics. The legal impetus, it argues, came from the "necessity" and "fair and equitable" requirements of § 1113(b)(1)(A), under which its first proposal had to be the *least invasive* of the union members' contractual rights to compensation and benefits under all the circumstances. The inflexibility of its stance on the three points, it maintained, was dictated by the several threats the Debtor undeniably faced: the certainty of a revenue cut at Northwest's instance, if it was even able to retain business from Northwest; the weighting of the seniority of all of its union employee groups toward the upper reaches of compensation rates, in contrast to most regional carriers; and the need to project an emergence from bankruptcy with a profit margin strong and consistent enough to make the Debtor attractive to lenders for interim and exit financing, and to give it a financial cushion against future instability in the industry. Thus, the Debtor insists, the looming threat of financial failure made its three assumptions a bedrock from which it could not depart, unavoidable and indisputable; and if any of the unions' members were to retain employment with the Debtor, their representatives had to accept that bargaining would be limited to the allocation of labor cost reduction among various *forms*, with the *amount* of the reduction to be a non-negotiable given.

This is another point on the matter of good faith that veers over into the merits of the Debtor's proposal, the necessity of that proposal to a reorganization. The appropriate context for the analysis of these considerations is the second phase of

---

**35.** And, they certainly got enough together to make for a long, bruising battle over many days in court.

this decision, the application of the substantively-oriented elements of § 1113. Reserving the discussion for that phase makes more sense, in terms of logic and comprehensibility. Suffice it to say, at this point, that the Debtor was not acting without good faith when it insisted on structuring the boundaries of both the bargaining and its outcome with these three points as a given.

To be sure, this did not follow the conventions of "Section 6" bargaining under the Railway Labor Act, as Borer testified to them. But if the Debtor had started off at some polar position in its proposal, completely beyond the bounds of a reasonable and temperate resolution, it would have been far, far more vulnerable to an accusation of bad faith gamesmanship *in the context,* under § 1113(b)(2). Under bankruptcy law, there was neither the time nor the warrant to go through an extended exercise of posturing, blustering, grinding, and incremental falling back—whatever expectations of that the unions may have brought into the process, couched by the dynamics under mainstream labor law.

▆▆ The last matter asserted as a badge of the Debtor's bad faith is raised by ALPA. It involves concerns unique to ALPA.

When in September, 2005, Northwest announced the reductions to the Debtor's fleet, the Debtor began to plan for reassigning its pilots between types of aircraft. Before then, the Avro regional jets had been considered as the superior form of flying done by the Debtor, assigned to pilots with higher seniority. With the

phase-out of that sort of assignment, those pilots were entitled to be reassigned to the Saab turbo-props.[36] Under FAA regulations, the reassigned pilots had to go through training for their new craft. Apparently ALPA's collective bargaining agreement had terms for retraining that were more involved or costly than that legally required.

In a voluntary effort toward cost savings, and in light of the inevitability of the reassignments, ALPA agreed to make concessions on the Debtor's obligations to the pilots consequent to the fleet downsizing, in the specifics of retraining and possibly in other matters.[37] This resulted in "Letter of Agreement 18" ("LOA 18"), dated October 24, 2005, which modified the 2004 collective bargaining agreement. The parties agreed that ALPA's concessions resulted in cash savings of $2,390,000.00 for the Debtor, which would be realized over the term of the Avrorelated downsizing.

During the negotiations toward LOA 18, the matter of larger and more permanent concessions from ALPA was broached, in contemplation of later proceedings under § 1113. Captain Mark Nagel, the local Negotiating Chairman for ALPA, asked the Debtor's special labor counsel whether ALPA would get "full credit" for the concessions made under LOA 18 against the larger § 1113 modifications or whether the Debtor would inflate the amount of its initial demand under a § 1113 proposal to negate the value of the credit for LOA 18. In response, counsel stated that the Debtor would "offset the credit" for LOA 18 against the "ask" under § 1113.[38]

---

**36.** To the extent that the pilots previously assigned to the Saabs had lowest seniority, they were and are to be furloughed if they did not voluntarily quit.

**37.** The Debtor had approached ALPA on this issue in the mid-fall of 2005.

**38.** The phrasing of Nagel's question suggests that it was put to the Debtor in a rhetorical way, or in a snide or accusatorial tone. Nonetheless, the inquiry was a fair one, directed toward material information that ALPA's negotiators had a right to know.

When the Debtor presented its costing sheet to support its first § 1113 proposal to ALPA, it added the total amount of anticipated costs for retraining pilots for the downsized fleet in 2005–2006 to the raw cost of wages and health and dental insurance, to get the total to which the 19.4% factor would be applied to arrive at a dollar-value for the cuts attributable to ALPA's members.[39] When confronted about this at the December 5, 2005 meeting, one of the Debtor's lead negotiators admitted that the Debtor had always intended to do this.[40]

In that first costing sheet, the Debtor valued the pilot training for downsizing "above the line" at $10,790,000.00. When the 19.4% reduction factor is applied to it, the result is an additional $2,090,000.00 by which *other* labor costs attributable to the pilots—in the main, wages—must be reduced.[41]

ALPA characterizes this specific sequence of events as a badge of bad faith on the Debtor's part. It is impossible to disagree with that. There was no testimony going to whether ALPA's representatives relied on the Debtor's counsel's representation regarding the mechanics of crediting savings under LOA 18, but that is beside the point. ALPA was responsive to the

Debtor and forthcoming on the matter of an immediate avenue for labor cost savings. As obdurate as its representatives may have been for the next couple of months on the true and bigger issues, that deal should be a deal.[42] While it is true that the Debtor does not incur these very substantial training costs for any employee group other than the pilots, the use of any device to extract a reduction in pilots' compensation that is traceable back to retraining costs is historically unprecedented in the Debtor's operation. In light of the assurance given to Nagel in connection with ALPA's concessions under LOA 18, it is just not warranted. The attempt to merge this issue into the extractions from ALPA, rather than treating it as an assumed general cost of operations that would not be subject to reduction, was an act that was not in good faith toward ALPA.

The ultimate point on good faith to be treated on the unions' plaint is the Debtor's failure to turn over to them a "working" digital-format copy of the Mercer Model. The unions raise this point somewhat as an afterthought, but it is worth treating. As the issue of the Mercer Model began to roil around in court hearings

---

39. The parties' term for this technique was to put the retraining costs "above the line"—i.e., into the portion of the costing sheet's format for the "base" labor cost rather than as a future expense "below the line" that could be reduced as part of the ultimate savings, or as a general expense of the Debtor's operation that would not even factor into concessions by ALPA.

40. In his testimony, Nagel used the phrase "charged the pilots for the transition training costs." This verbiage is inaccurate, because it implies a directness of *application* that just is not there.

41. Apparently one of the pilots' signal annoyances is that the training costs themselves

could not be reduced, at least at the Debtor's unilateral action during these calculations, because the type and extent of retraining was largely mandated under law and because the charges had been fixed under contract with the provider of training.

42. The near-coincidence of the value of ALPA's concessions under LOA 18 and the value of the "charge-back" of retraining costs under the first costing sheet may be only that, a coincidence in regards to causality as well. ALPA's insinuation that the whole thing was long-planned in that detail has no support in the record. Nonetheless, the functional outcome of the technique marks its use as something of a de facto double-cross, in outcome if not necessarily in the inception.

during the weeks before the evidentiary hearing, it was tempting to attribute the Debtor's refusal to a wish not to give a dangerous weapon to its opponents—something that could in fact enable them to make an arguable case against the Debtor. (This was before any party had mentioned the evolved custom-and-usage in other airline Chapter 11 cases as relevant to the issue.) As things emerged on the record, however, that was never a reason that the participants on the Debtor's side articulated to themselves, let alone argued to the Court. At most, the reluctance was justified on the possibility of "misleading" or inaccurate output from the model—something to lead the unions astray, and probably further from a position that the Debtor wanted, but not something to build an affirmative case to counter the Debtor's.

Since the Debtor's vague and somewhat plastic excuses came down to nothing effective, the failure to surrender does have to be attributed to a less-than-replete intent to reach an agreement *in which the unions were fully informed.* At that time, then, this too gave support to a finding that the Debtor was not meeting and bargaining in good faith.

So, in the end, the Debtor did not make a full showing for the seventh element under *American Provision Co.* either, and cannot be deemed to have met that requirement.[43]

### B. Substantive Requirements

The second group of elements under *American Provision Co.* goes to the substantive content of the proposal by the debtor-in-possession, and to the merits of the unions' pre-motion rejection of it.

■ The third element under *American Provision Co.* is certainly the most fact-intensive of all of them; the proposed modifications must be "necessary to permit the reorganization of the debtor." 11 U.S.C. § 1113(b)(1)(A). The debtor-in-possession has the initial burden of production under this element. *In re American Provision Co.,* 44 B.R. at 909–910.

Like § 1113 in general, *In re Family Snacks, Inc.,* 257 B.R. at 891–892, the statutory language for this element is cumbersome and difficult. First, there is the duplication of a key adjective, the debtor-employer's proposal being required to "provide[ ] for those *necessary* modifications ... that are *necessary* to permit the reorganization of the debtor ..." (emphasis added). Second, the operative verb, "to permit," is an odd choice, not reflecting the wording of any other relevant provision of Chapter 11 and not having a very precise connotation in context.

This facial looseness of language, as well as the lack of any strong and suitable legislative history, early led to a split between the circuits in the construction of the statute's principal modifier, the word "necessary." The two lines of authority emerged soon after the enactment of § 1113, in decisions from the Second and Third Circuits.

The Third Circuit rendered its decision first. *See In re Wheeling–Pittsburgh Steel Corp.,* 791 F.2d at 1074. The *Wheeling–Pittsburgh* court construed the "necessity requirement" of § 1113 in a fashion more

---

**43.** Some courts apparently contemplated that a debtor can fail the good faith element on a refusal to negotiate on a single issue. *In re Royal Composing Room, Inc.,* 848 F.2d 345, 349 (2d Cir.1988); *In re Mile Hi Metal Systems, Inc.,* 899 F.2d at 892; *In re GCI, Inc.,* 131 B.R. 685, 695–697 (Bankr.N.D.Ind.1991).

It is not necessary to go so far as a holding to that effect. But, these cases are certainly consistent with the proposition that a union need not prove an utter, across-the-board lack of good faith as to the debtor-employer's full proposal, in order to meet its shifted burden on the seventh element.

deferential to labor unions' fixed expectations under their collective bargaining agreements. It started by parsing through the published statements of several congressional participants in the evolution of § 1113. From those, it concluded that the "legislators[] . . . placed the emphasis in determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation, the mirror image of what is 'necessary to permit the reorganization of the debtor.'" 791 F.2d at 1089. Opining that § 1113 was the product of an "insistent congressional effort" toward a standard "that was more sensitive to the national policy favoring collective bargaining agreements," the Third Circuit contemplated that § 1113 be applied with an "emphasis on the reorganization, rather than the longer term issue of the debtor's ultimate future." *Id.* Thus, *Wheeling–Pittsburgh* has been read consistently as limiting the range of modifications to those "necessary" to preventing an employer's reorganization case from being converted to a liquidation under Chapter 7. This contracts the horizon of consideration to the potential duration of the bankruptcy case. More to the point, it substantially reduces a debtor's latitude in imposing cuts in wages and benefits.[44] *In re Appletree Markets, Inc.*, 155 B.R. at 440; *Int'l Union, UAW v. Gatke Corp.*, 151 B.R. at 212–213.

Within a year, the Second Circuit rendered its opinion in *Carey Transp.* The *Carey Transp.* court rejected the *Wheeling–Pittsburgh* analysis of legislative history, noting tersely that the floor remarks quoted in *Wheeling–Pittsburgh* went to a version of language that ultimately was not enacted in § 1113. To the Second Circuit, "this suggest[ed] that [Congress] was uncomfortable with language suggesting that a debtor must prove that its initial postpetition proposal contained only bare-minimum changes." 816 F.2d at 89. To the contrary, the court held, given the backdrop of requirements for confirmation of a plan under 11 U.S.C. § 1129,

> in virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health.

*Id.* Thus, as the *Carey Transp.* court concluded,

> the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, *but not absolutely minimal,* changes that will enable the debtor to complete the reorganization process successfully.

816 F.2d at 90 (emphasis added). This standard has been characterized as "more flexible" than the *Wheeling–Pittsburgh* formulation. *In re Family Snacks, Inc.*, 257 B.R. at 893. Ultimately, "more flexible" is properly read as "more deferential to the debtor," in terms of the depth of concessions that may pass muster under the necessity requirement—or, from another perspective, less deferential to the

---

44. Among other things, the *Wheeling–Pittsburgh* court was quite critical of the absence of "snapback" provisions in its debtor's initial proposal, 791 F.2d at 1090–1093; it suggested an exacting scrutiny of any differential treatment of employment terms for salaried and non-union employees versus that for union members, 791 F.2d at 1092; and it considered the potential losses to unionized employees' interests as being very much on a par with the possible treatment of *creditors'* claims in consummation of a plan, as factors for the mix in the "fair and equitable" requirement of § 1113(b)(1)(A), 791 F.2d at 1092–1093.

fixed terms of the collective bargaining agreement in question.

The *Carey Transp.* standard appears to have taken a majority among subsequent published decisions. E.g., *In re Big Sky Transp. Co.,* 104 B.R. at 336; *In re Texas Sheet Metals, Inc.,* 90 B.R. 260, 265 (Bankr.S.D.Tex.1988); *In re Amherst Sparkle Market, Inc.,* 75 B.R. 847, 851 (Bankr.N.D.Ohio 1987); *In re Walway Co.,* 69 B.R. at 973; *In re Valley Steel Products Co., Inc.,* 142 B.R. at 341; and *In re Express Freight Lines, Inc.,* 119 B.R. 1006, 1014 (Bankr.E.D.Wis.1990). And, of the two, it is founded on a more accurate reading of the odd legislative history of § 1113. Finally, it is more responsive to the provision's context. Section 1113 is, after all, a part of a broader enactment providing for the long-term rehabilitation of distressed businesses, toward which the abrogation of contracts disadvantageous to a debtor's financial stability provides a supporting remedy. It is not found in the large intertwinement of legislation that established a national labor policy in the early 20th century. It is thus to be read in light of the future survival of the employer as a stably-operating (and employing) enterprise—however that may lay against the terms of a collective bargaining agreement negotiated in a different time and under different economic conditions.

 This conclusion has little effect on the treatment of many of the individual contentions raised by the unions in this case. It does, however, establish a frame of reference: what, indeed, must be extracted by way of wage and benefit reductions and other employee concessions to so improve the Debtor's cash flow that it could emerge from Chapter 11, financially stable and viably competitive in its sector of the airline industry, and could remain so? As noted earlier, this inquiry is quite fact-intensive. Ultimately, the standard calls for a group of measures that would promote fiscal soundness in the longer term, before and after emergence from Chapter 11, but which will not curtail union members'' prior contractual entitlements more than is reasonably necessary for that promotion.

With that level of focus, one can examine the specific aspects of the Debtor's proposal that are in contest.

The Debtor built its initial proposal on the December 2, 2005 business plan, a long-term projection of revenues and expenditures that targeted a desired operating margin (to be loosely equated with the layperson's conception of "profit"). The plan's projections were built on a group of fundamental assumptions, summarized *supra* at p. 712. Some of these assumptions went to factors that originated outside of the Debtor, and some were "internal" to it.

Because the business plan dictated the ultimate depth of labor cost reductions, its assumptions and methodology are key to the question of whether the Debtor's proposal meets the necessity requirement of § 1113(b)(1)(A). The unions have challenged almost all of these assumptions, in their attack on the Debtor's case for that element.

### 3. Necessity of the Modifications to Permit the Reorganization of the Debtor.

#### a. Anticipation of 5% Drop in Revenue.

 On the input side of its business plan, the Debtor assumed that its revenues from airlink flying for Northwest would decrease by 5% by fiscal year 2006, and would remain at that decreased level over the six-year term of the plan. In their original responses, the unions put the Debtor to its burden of proof on this assumption, as a matter of fact. In their closing, they summarily maintain that the

Debtor "has offered no admissible evidence to substantiate [this] assertion."[45]

In the end, the unions' response on this issue is only so much dithering for show. The evidence is both pointed and uncontroverted, that at the very best the Debtor will have to agree to a reduction of 5% in the rate it charges, down from that to which it was entitled under the Omnibus ASA, as a condition of retaining any form of airlink flying from Northwest. Northwest essentially has already yanked the CRJ flying that it contracted to Debtor under the Omnibus ASA. That work is now out on a bidding process that was quite competitive in the first round in early 2006. Through statements from its executive in charge of "Network Strategy and Airlink Administration," Northwest communicated its expectation that the Debtor would reduce its rate by at least 5%, and possibly up to 8%, as a condition of keeping the Saab flying in the wake of Northwest's about-face on the CRJ placement. The communication here was more in the passive—"not disagreeing" with a suggestion to that effect that Hien Cao, the Debtor's Director of Strategic Planning, floated to that executive to sound out Northwest's position. However, the communication was quite unequivocal, that this was what Northwest would extract for the continuation of its favor.

Though the unions have tacitly sneered at the credibility of this evidentiary proffer, there is not a reason to doubt either the likelihood of this eventuating or the soundness of the Debtor's reliance in building the reduction into its assumptions. All of the witnesses who spoke to Northwest's bargaining style and its substantive positions on contractual terms affirmed that Northwest had been a tough bargainer on financial matters for many years, rarely if ever "leaving anything on the table" at the close. Northwest's assumption of the fiduciary role of debtor-in-possession in its own Chapter 11 case layered an overarching legal obligation onto its established practice of hard-bitten and relentlessly self-interested negotiation. So, Northwest has not only a de facto need to claw itself back to profitability, it has the imposed obligation to manage its assets for the greatest gain to its own bankruptcy estate. With those two drivers, there is no goal that can credibly be imputed to Northwest other than to squeeze all it can out of the parties with which it contracts, as long as it can ensure a requisite level of service from them under those sharper terms.

Thus, the Debtor was entirely in bounds in building the assumption of a 5% reduction in its revenues from Northwest into its business plan, and in thus establishing the boundaries of aggregate income with which it had to work in formulating an operating budget of expenditures.[46] Its

---

**45.** In lieu of closing argument or post-hearing briefing, the Court directed the submission of annotated proposed findings of fact and conclusions of law from both sides. Counsel did a very nice job of clearly underlining their clients' respective positions on all issues, via this format.

**46.** If anything, the Debtor may be too sanguine in limiting the assumed reduction to 5%, but it pretty much has to do that. The vaguely-phrased post-petition exchanges between the Debtor and Northwest suggested that Northwest might seek an even deeper reduction, up to 10%, as a condition of retaining the flying. However, as Cao credibly testified, the Debtor has rejected anything more than 5% as an assumption, because a greater reduction projects out to labor cost cuts that simply would be unsustainable. (Whether the refusal to countenance this possible future is the product of sympathy for employees, simple realism, or a combination of them, is not legally relevant. However, the fact remains that the Debtor's management did reject some permutations as entailing too much to demand of its employees. If that judgment is

use of this assumption as a base component of its proposal does not fail the necessity test. It is quite likely that the Debtor will have to operate within these confines of revenue for the future foreseeable after an exit from bankruptcy.

### b. *Projection of Operations on 48–Saab "Steady–State" Fleet.*

The next assumption goes to the input side of the Debtor's business plan as well. In forecasting business volume for its revenue projections, the Debtor assumed that it would conduct business over the six-year term of the plan using a fleet of 49 Saab turbo-prop aircraft alone, flying for Northwest to the local markets that are most suited for service by these smaller and lesser-range aircraft.[47] In numbers of craft, this fleet would be half the size of the one that the Debtor was operating when it went into Chapter 11.

The unions challenged this assumption, with the insinuation that it is an artifice—reflecting a temporary state of affairs at most, and in any event resulting in a substantial understatement of potential revenues and profitability, all toward a crafted exaggeration of the need to substantially lower employee wages.

There are two dimensions to this objection.

The first is the practical, factual one: just how reasonable is the Debtor being in assuming that it will be operating on this reduced level, and for an extended period? The unions point to factors both historical and economic to challenge the Debtor on whether this will come to pass.

On the historical side, the unions point to the fact that the Debtor has not operated with as small a fleet in years, and simply should not be expected to do so given its past flourishing at a larger complement.[48] That much cannot be denied. But it is equally undeniable that the Debtor is in a turn of events that is historically unprecedented. Northwest is well into the process of pulling the Avro RJs out of the Debtor's fleet; all will be gone by the end of this year. When this motion was submitted, the Debtor had no guarantee of keeping the CRJs it then held at the de facto sufferance of Northwest, a paltry two in number. It was one of eight competitors for the CRJ flying that Northwest had baldly deigned to put back out for bids despite its recent entry into the Omnibus ASA with the Debtor.[49] The Debtor had no overt assurance of keeping even the Saab flying, and the circumstances going to that were a mixed bag.[50]

confronted by obduracy from Northwest on the issue, the whole exercise before this Court will probably be an academic one.)

**47.** Dr. Daniel P. Kaplan, one of the Debtor's expert witnesses, testified that turbo-prop aircraft will continue to fill a niche in regional flying, largely for hops of 400 miles or less into a network carrier's hub.

**48.** There is almost nothing in the record as to the makeup of the Debtor's fleet before it took on the Avros in the late 1990s. However, what there is, suggests a fleet size during the 1990s of at least the 100–or–so craft it had during the first half of this decade.

**49.** Indeed, as came out in the testimony of several witnesses, the Debtor is losing money

overall by maintaining the CRJs in its fleet, with the substantial payments it already made for pilot retraining now by the boards without the planned return via placement of personnel into actual service on 15 CRJs.

**50.** On the one hand, there was the very reasonable fear that Northwest would make no exception for the turbo-prop flying in its drive to slash post-petition expenses, and would put that component out for bids via RFP as well. On the other, there was the fact that by mid–2005 the Debtor was the largest flyer of Saab turbo-props among U.S. airlines, and had been very successful in economically providing good service to smaller markets while doing so. Cutting back again, however, was the specter of technological and market obso-

In the last instance, however, the "steady-state" fleet was both the one thing on which the Debtor could defensibly project a future operation, and the *only* thing on which it reasonably could. As tenuous as its continuing tie to the Saabs may be, as subject to Northwest's swagger in the incipient threat of rejecting the Omnibus ASA outright, the steady-state fleet is all that the Debtor has any claim to count on. The Avro flying is simply not to be considered; for as long as it will last, the revenue from it is in a sense "found money." The Debtor may not get any CRJ flying from Northwest or any other carrier; the world of competition for the work is densely-populated;[51] the Debtor is hampered in its competitiveness in this new crop of regionals;[52] and institutional allegiances between prior airlink partners have dwindled in a decade characterized by extremely intense competition in the industry, external and internal.

The Debtor was not out of line in envisioning this future; there was simply nothing else it had any claim to count on when it assembled its business plan and when it formulated its proposal to the unions.[53] It would have been irresponsible to have constructed a business plan premised in part on flying that had not been awarded to the Debtor from a broad field of competitors, or a business possibility that had not even been put before the Debtor via an RFP. The obligations of a debtor-in-possession required the Debtor to be realistic and to stick to what was right before it, to avoid wasting the bankruptcy estate's resources by advancing and defending a restructuring that was not backed by an arguable projection of economic reality. So, because the assumed fleet size beneath the business plan was the only one that was not impermissibly speculative, it cannot be said that the modifications of employee compensation that the Debtor projected from that plan were not "necessary" to a possible reorganization of the Debtor.

The second dimension to the unions' objection goes to whether factoring in a speculative alternate future for the Debtor could even be consequential. The uncontroverted evidence on the actual income to

lescence. The particular model of Saab is no longer in production by the manufacturer, which limits the supply of replacement craft to those currently in service at other airlines. And, shorter-haul commercial flying in the United States has started to shift away from turbo-props.

51. There was testimony that the total number of regional airlines operating in the United States today is three times what it was less than a decade ago.

52. Many of the regionals vying with the Debtor for the work have a staffing seniority demographic and labor cost structure that enables them to present bids to undercut the Debtor's.

53. To the extent that it touched on this point, the testimony of one of the unions' expert witnesses was particularly puzzling. In connection with his opinion, Akins stated that he had looked at the Debtor's business plan "with a fair degree of skepticism," because

"Northwest was allowing essentially its regional feeder partner to cut about half of its feed by virtue of dropping the Avro fleet and that didn't make any sense" to him. Akins noted that "[t]here are other aircraft out there that would fit the bill better than the Avros," for fuel efficiency and economy in the market, from which his advice was to "[g]et a different airplane"—because the Debtor "was betting the future on short-haul prop aircraft and that really didn't make sense." In the abstract this was a point. But apparently no one had told Akins that the Debtor had no self-exercisable choice of aircraft, and that it did not have an independent position as a provider in the air transportation industry that would give it that control over its equipage and market placement. This cast into doubt the tenability of much of Akins's opinion, in that he evidenced no clue as to the consequence of the Debtor's utter dependence on network carriers like Northwest.

be captured from a CRJ award under the current Northwest RFP bears out the Debtor's argument, that doing this would have had no ameliorating effect on the need to cut labor costs anyway. This is due to a tectonic shift within the airline industry, the substantial transfer of bargaining power between network carriers and their regionals that has occurred in the last several years.

The testimony of expert witnesses from both sides was basically uniform on the historical backdrop to this. With the puncturing of the "NASDAQ bubble" in 1999, and heightened after the disaster of September 11, 2001, the traditional mainline carriers in the United States suffered through a sharp drop in business volume. Then they had to contend with meeting competition from new low-cost, long-distance carriers, and other impacts on their business volume.[54] In the process, they lost billions of dollars in the first half of this decade;[55] and they were lucky if they generated operating margins of 1 % to 2% in the few fiscal periods of profitability they experienced during those years. On the other hand, the smaller regional airlines that have provided airlink service to the legacy carriers did relatively well under the ASAs that were in place during the first half of that period; on average, they generated operating margins of 6.4% to 12.6% during 2002 and after.

As the mainlines' financial distress became intractable after 2001, and in particular as many of them had to seek protection under Chapter 11, they turned to their relationships with their regionals as an avenue through which to reduce their own costs. From the mid–1990s, new regional airlines were established, prompted by the earlier profitability of this sector. The network carriers have taken to playing off the members of this larger pool against one another. They have done this by putting more "fee-for-departure" service provision out for competitive bidding, and by creating a more extended, involved, and intense process of evaluating and treating those bids toward extracting the lowest possible price from a winner.

The latter development has taken place in just the last several years. It plays its way out on the Debtor's assumption on fleet size as follows.

One of the unions' major complaints with the Debtor's reliance on a "steady-state" scenario is that it projects a static profitability. This, they claim, is not realistic because it does not take into account potential "economies of scale" that could result from business expansion through awards of additional flying, under the current Northwest CRJ RFP or for other network carriers under future RFPs. As the unions would have it, such economies of scale would come about from spreading a current level of fixed costs, or one not materially larger than at present, over a larger revenue base. This would leave more unapplied income that could be used to ameliorate the reductions of wage and benefit outlays that the Debtor would otherwise have to obtain from union members to cope with the 5% revenue reduction.[56]

However, the unrebutted evidence was that network carriers have so modified the

---

54. In his testimony, Spanjers also noted drops in the volume of consumer air travel due to the "SARS scare" of several years ago, and the general public's worry about terrorism, as well as the upspikes in fuel costs attributable to the Iraq war and the more recent impact of Hurricane Katrina on oil production along the Gulf Coast of the United States.

55. Without challenge from the unions, Spanjers testified that American legacy carriers had lost 35 billion dollars in total since 2001.

56. The evidence did not suggest a large number of potential cost savings from economies of scale. Nor did it go very much to the actual dollar-value of them. Mentioned were such things as a more intense use of existing

length, complexity, and exactitude of their bid review process that regional carriers simply cannot expect to preserve any material benefit from economies of scale in an expansion of their flying, if they are to be the winner of the business. Whatever the mainlines' practice was in the past, now they evaluate regionals' bids in at least two stages.

The first is the garnering of bids in response to a public solicitation, submitted with detailed costing sheets to set forth all of the expenses that the bidders project and hope to recover via the anticipated revenues from their performance. The second stage begins with the mainline's close review and vetting of every projected cost. The mainline examines every line-entry as to whether it should be built into the costing structure and charged back to the mainline for recovery via the rate. As the testimony shows, the network carriers have taken to this analysis with great parsimony, going back to the competing bidders with large aggressiveness. First, they identify fixed-cost charges that they think the regional already recovers in whole or in part via the rates for existing flying that the regional is doing already. They identify line-entries in some bidders' submissions that are not even presented in the costing from other bidders. And they identify prospective costs that they believe are more properly chargeable as a fixed or general expense of doing business, to be offset against an operating margin rather than recovered directly from a mainline customer. Then they go back to the competing bidders, identify all such costing components to each, and inform each that it had best "sharpen the pencil" to delete these items for a revised bid or it will not remain for the final cut and a possible award of the flying.

There is no evidence of record that any of the major mainlines with which the Debtor could hope to do future business does not do this. More to the immediate point, Northwest unquestionably is doing this at present, and will do it, and relentlessly so.

The only possible conclusion from that, on an industry-wide basis, is that now and in the future the mainlines will demand that all "economies of scale" in a regional's operation are upstreamed to them, via a forced deletion of any associated expenditure from the structure of a winning bid. Apparently they will condescend to allow a winner to build an operating margin into its costing—Northwest allowed for a range of 5% to 10% in the 2005 CRJ award to the Debtor, carried over into the Omnibus ASA—but they will not allow any ostensible enhancements of that to be embodied in costing entries that are not expressly labeled as profit. The corollary, of course, is that if such branded expenditures actually must be incurred, and are not to be recovered directly from a network carrier via revenues received, they will be charged as a general expense of business, to be funded via reduction of the operating margin or via third-party investment.[57]

The clear and unmistakable implication for the unions' argument here is that there simply will be no meaningful economies of scale to be factored into the Debtor's fi-

---

non-aircraft physical facilities and equipment (the Debtor's headquarters building and data technology hardware); lower per-capita regular expense for pilot training with a more intense use of staffing to handle greater business; the possibility of greater-volume discounts from vendors of supplies and fuel; and the like.

**57.** One example that came out in testimony was the expense for the extensive sort of pilot training that would be required for the start-up of flying an aircraft model that a regional had not previously used. It appears that mainlines are simply not allowing any bidder to build such an expense into their costing structure, if there is at least one competitor that already has a sufficient complement of

nancial operations in the event of business expansion. The dynamics of the market for regional flying have changed that much, and so quickly. If there would be no such, expansion would not generate any larger margin, net of personnel costs; thus, it would not enable any amelioration of the cuts to wages and benefits that a steady-state fleet scenario would otherwise dictate. As a result, the Debtor has not failed the necessity test by projecting on a static fleet size alone.

### c. Targeting of 8% Operating Margin After Restructuring.

██ The third challenged assumption is one of those that are most inflammatory to the unions. After consultation with the Mercer professionals, the Debtor's management decided to construct a business plan for operations that would generate an operating margin of 8% per year. As the unions point out, when this is cumulated with the first two assumptions and the internally-oriented one as to employee attrition,[58] this assumed margin ultimately drove the target for labor cost reductions up to 19.4%.[59]

The tone of argument, interrogation, and testimony on this issue got tweaked up to a high degree of emotion.[60] With that emotional edge blunted as it must be in any legal proceeding, the question comes back down to what the Debtor has framed: is the attainment of an 8% operating mar-

---

pilots with the requisite training and thus would not have to incur and recover the expense if it won the flying.

58. Treated *infra* at pps. 743 – 746.

59. This, of course, was after taking into account the bedrock reductions for all costs not related to labor.

60. Most likely, this stemmed in part from extrinsic circumstances that are legally irrelevant to the question of whether the Debtor's business plan gave rise to a proposal with modifications that are limited to those statutorily "necessary." Much of the expressed resentment on the part of union representatives and members stemmed from their belief that MAIR Holdings, the Debtor's parent company, would be the beneficiary of the targeted operating margin when it was realized, or at least the major part of it. No evidence was forthcoming that MAIR's interests got any consideration in the setting of the margin, however. Spanjers denied that the Debtor even consulted MAIR on the issue. Nonetheless, it kept getting pressed forward. Several years of recent history suggest the genesis for this outrage: MAIR, a publicly-held company, had received very substantial sums from the Debtor during the several years before the Debtor's bankruptcy filing. These payments had been cast as shareholder dividends or as fees for MAIR's performance of "management services" to the Debtor under a 2003 agree-

ment. MAIR was cash-rich when the Debtor filed for Chapter 11, holding in excess of $60,000,000.00. Early in the "1113 process," the Court denied the unions' bid to raise this circumstance as a substantive objection, by rejecting their argument that recovery of these sums as an avoidable fraudulent transfer would somehow enable smaller cuts to wages and benefits than those the Debtor would propose. The ruling against the unions' attempt to open discovery on this theory was based on the Court's construction of the statute, as going in the main to long-term operational factors, rather than turning on a single potential recovery of monies that would have to be committed to payment of *creditors'* claims under the Bankruptcy Code's priorities anyway. (The Debtor's committee of unsecured creditors has been evaluating the possibility of exercising avoidance remedies against MAIR for several months.) Nonetheless, the perceived avarice of MAIR and its shareholders has been a flashpoint again and again in this litigation and in the case more generally. The fact that the chair of MAIR's board is a locally-resident, nationally-prominent businessman of extremely large personal wealth and renowned aggressiveness is legally irrelevant, though—however much the vast contrast in personal means is an understandable goad to the regular working people whose labor keeps the Debtor running. Like it or not, MAIR has a legal existence separate from the Debtor's. Its position and function as the Debtor's sole shareholder was a part of the

gin essential to the securing of the confirmation-related financing that the Debtor believes it will require to successfully emerge from Chapter 11? [61]

This issue was presented via evidence in argument that got quite technical and down to fairly fine detail. When it was cast as whether the general market for exit financing would dictate attainment of the 8% operating margin, much time was spent on whether other airlines had been able to complete bankruptcy reorganization, using exit financing or not, with a like operating margin, or a lesser one.

However, the real issue is what target an operating margin will most promote *this debtor's* survival through confirmation, setting it on a course "to complete the reorganization process successfully" and "to attain financial health," *Carey Transp.*, 816 F.2d at 89–90, with the least invasion of employees' entitlements under their collective bargaining agreements. With that longer-term frame of reference, the testimony of Peter Walsh, one of the Mercer consultants, bears much weight: in emerging from Chapter 11 into an intensely competitive market, a debtor should come forward close to the top of the heap in strength, rather than at the bottom. Otherwise, it will not have the flexibility to remain competitive, or present the general attraction of future stability to prospective

landscape of this case at its inception. That had to be accepted, going forward. MAIR is under the jurisdiction of this Court only in its capacity as the Debtor's shareholder. And, as a publically-held company, MAIR has a very delicate relationship with its own shareholders that affects its interface with this case in a fashion that none of the other constituencies can much control.

**61.** The framing of this question subsumes a finding that does not merit extensive discussion in the text: the Debtor *will* have to establish creditworthiness for some form of "exit financing" to fund the consummation of a confirmed plan. In the first place, the Debtor's internal means—the cash balance created in large part by MAIR's August, 2005 infusion—is a vanishing commodity. The evidence of record bears out the Debtor's current projection, that under present levels of revenue and expense it will go "cash-negative" in the late summer of this year. The unions did not waste time in arguing this point of fact, which goes to the Debtor's own resources; the Debtor will indeed need to secure DIP financing to sustain its operations during this case. In their post-hearing submission, the unions argued that the Debtor had "offered no evidence that exit financing [was] needed." Alone out of all of the unions' objections, this one is utterly baseless. The testimony regarding the current dynamics of landing regional flying from network carriers shows that, literally, almost "anything goes" when it comes to the "inducements" that the

mainlines may demand of regionals as *lagniappe* after they have arrived at the lowest submitted rate. One form of inducement recently obtained by another network carrier was a requirement that the regional carrier provide the aircraft with which it would service the ASA, whether by direct lease or by outright purchase. A regional can no longer count on a network carrier affording the large accommodation of a pass-through sublease of aircraft, like the ones Northwest gave to the Debtor on the Saabs, Avros, and CRJs in the Debtor's fleet. The mainlines clearly want to reduce their cost and financial exposure on all possible incidents of the airlink partner relationship. Direct aircraft acquisition of this sort often requires a large payment of cash up-front. Too, cash would be required to make an equity infusion in a mainline as a condition of airlink flying that would be initiated at the consummation of a plan—and that, too, has recently been an inducement demanded and obtained in real life. And, finally, there are such things as deposits or reserves to cover spikes in fuel costs that might have to be made. It is too early to know whether the Debtor would have to make any of these lump-sum expenditures to get out of bankruptcy. But there is no question that it must be prepared to deal with them via advance availability of credit, if they do emerge. To deny that is close to an infantile refusal to recognize the huge recent industry-wide changes—not to mention management's responsibility to deal with them, if the going concern is to go on.

airlink partners. And a lack of those qualities may well lead to a second financial failure.

Beyond that, the conclusion reached by Thomas Schmidt in conjunction with the Mercer professionals had both surface and deeper validity: a target for operating margin set somewhat higher than the prevailing experience of airlines emerging from bankruptcy, and in the mid-range for an economically-healthy airline was most appropriate. It was much more likely to offset the unavoidably negative characteristics in the Debtor's profile for credit risk: it would have gone through a forced downsizing during the course of this case, and until Northwest emerged from its own reorganization the Debtor would have all the vulnerability inherent in having its only current customer in bankruptcy.

The record also disposes of two other arguments the unions raise on the matter of a target operating margin.

The first was that the goal of 8% was excessively high, and that current experience in the industry, even in its distressed end, suggests that the Debtor could succeed with a lower one. The only example cited was Northwest. In its own bankruptcy case, Northwest has indicated that it believes it will obtain exit financing with its projection of a 6.5% operating margin. This is all very well and good, but the argument ignores the context, and the realities of the financing market.

The record contains a decent amount of evidence on the considerations that a likely exit lender or investor would bring to bear on the Debtor's application. It well-establishes that the degree of risk, the likelihood of prompt recovery of the principal, will ultimately couch a prospective lender's expectations for the Debtor's post-confirmation performance. That risk, of course, is to be determined in the very first instance by the Debtor's ability to generate enough net cash to reduce principal and to make debt service. For a higher-risk placement, a lender is likely to demand more accelerated payment terms.[62] The ability to satisfy such a requirement depends entirely on the generation of "profit," the operating margin.

In that regard, the Debtor presents a greater risk to a prospective lender than Northwest does. Northwest is a freestanding network carrier. It can set its own customer pricing, subject to prevailing competition; it can enter new markets on its own accord; and it is limited in either regard by only the residuum of federal oversight that is left since the full effectuation of the Airline Deregulation Act of 1978. It has far more control over its own destiny than the Debtor. As a regional carrier, the Debtor is entirely subject to the good graces of the network carriers that would grant it airlink flying under contract. To land the business on which its survival depends, the Debtor must meet their demands for financial accommodation as they make them.

It is undeniable that being a regional is a riskier business than being a mainline. That conclusion is compelled by the recent upspike of competition in a much larger field of parties and the proliferation of means in which a regional may have to compromise its latitude in order to compete. As a result, there is no inconsistency at all in Northwest forecasting a successful reorganization on the prospect of a 6.5% operating margin, and the Debtor believing that it must project an 8% margin itself to get through.

---

**62.** The same considerations would apply for an equity investment, where the return of the infusion would be accomplished through payment of dividends. That much was established by the testimony of Foley, MAIR's President.

Corollary considerations put the unions' other related theory to rest as well. That one is posited on an accusation that the Debtor "ignores the broad range of factors that allows a debtor to attract exit financing." Apparently the thought here is that the Debtor presents enough other positive factors in "liquidity, leverage and coverage" to make it credit-worthy for exit financing, that it would not have to project as high an operating margin as it has used for its business plan.

Unfortunately for the unions, they did not develop this theory beyond an attempt to discredit the Debtor's expert witnesses, on their testimony to the salience of the operating margin. The necessary avenue is simply not developed toward any material effect: what *is* there about the Debtor's asset structure or fiscal dynamic that *would* induce a lender? And whatever that is, what would be the impact on the lender's expectation as to operating margin?

With the initial shout being all there was, the point gets nowhere. In any event, in isolation it does not make sense. Lenders and investors look first and foremost to *recovery in cash,* the fungible form that is eminently suited to immediate enjoyment or reinvestment. Pledged collateral, "asset strength," or net shareholder equity is desirable for lenders, but realization on it after failure of a going concern entails delay, cost, *and risk.* As a vehicle of satisfaction, security is a second consideration for prospective lenders, an avenue of recourse and not their first wish. So, there is every bit of sense in the fundament of the Debtor's experts' opinions: in an industry as risky as air transportation is currently, operating margin is the most

significant consideration any prospective lender or investor would apply.

Getting back to the impact of that fact here, there is no question that with each drop of a percentage point in a target operating margin, a lesser cut in labor costs would be indicated. If the target were reduced to the 2–3% margin that the Debtor was actually generating in the several years before its bankruptcy filing, when it was making handsome payments to MAIR, the overall reduction would be halved or more.

That, however, is only a matter of abstract mathematics.

The real issue is what, in the complex and dynamic world of the current market, will best promote the longer-term viability of the Debtor. Clearly, the Debtor must be able to project a future attractive enough to a lender or investor that it can have its emergence from bankruptcy underwritten. An enhanced showing of one of two things would greatly increase the likelihood that a third party would put funds into play in the Debtor's operation, despite the other indicia of risk: the cushion of a reasonably-projected profit high enough to offset the other risk factors, and still make debt service on an extension of credit, or the reasonable assurance that prompt payment of dividends would cover the even greater risks of making an equity investment.[63] With the general ratcheting-up of risks in the regional sector of the airline industry, and those vulnerabilities specific to the Debtor, the judgment of the Debtor's management, informed by the advice of Mercer's consultants, that a target of 8% is necessary to meet those concerns,

**63.** In a liquidation, equity holders would have lower priority in distribution than any creditor—in bankruptcy or outside of it. 11 U.S.C. § 726(a)(6); Minn.Stat. § 302A.753, subds. 3 and 4; *In re Brose,* 339 B.R. 708, 714 n. 6 (Bankr.D.Minn.2006); *Erickson–Hellekson–Vye Co. v. A. Wells Co.,* 217 Minn. 361, 374, 15 N.W.2d 162, 170 (1944).

is sound enough to meet the necessity element.[64]

The discussion thus far has assumed that the Debtor would have to meet its need for exit financing in the open market. The centerpiece of AFA's evidentiary presentation on this issue, however, is summarized by a sentence in the unions' post-hearing presentation: the Debtor "ignores MAIR as a likely source of exit financing." The underlying thought is that MAIR would, or should, provide funding to the Debtor without demanding as high an operating margin as the Debtor has built into its proposal.

Of course, this argument feeds off the resentments against the Debtor's parent company noted earlier at n. 60, pps. 737–738. It is another demand for a tapping of "the MAIR money," but under a different legal guise. But, it was not inappropriate to raise the specific point in the context of this motion.[65]

In the last instance, however, the evidence simply does not bear out the argument, which is then reduced to nothing more than rhetoric. On the status of the case and record at this point, *there is no legal or factual identity between MAIR and the Debtor*. As a holding company, MAIR functions as an investment vehicle for its shareholders. MAIR's management is chargeable under law to those shareholders, for the decisions they make.

The Debtor is not MAIR's only holding or asset; MAIR has all that cash in its treasury as noted earlier, and it owns another airline, Big Sky Transportation Co. As a publicly-held company with a shareholder base of middling size, MAIR is vulnerable to claims under the securities and corporate laws, including accusations that management decisions inappropriately jeopardized the value of shareholders' investment. MAIR's management and board have every incentive to be very careful about risk before applying liquid assets to any external investment.

So the threshold point of whether MAIR *would* inject cash into the Debtor in the future is rather complex, setting aside the terms under which it would do so.

Via compulsion of subpoena, AFA called two executives of MAIR to testify to this matter. The specific content of their testimony need not be recapitulated. The endpoint of their evidence, directly and by inference, is unrebutted: MAIR's management and board are sitting out the question of whether to make further infusions of cash into the Debtor's operation in whatever form. They are awaiting the resolution of the labor issue at bar, as well as the conclusion of Northwest's deliberations on the RFP and the continuation of Saab flying. Until those two processes have seen their end, and perhaps not until the Debtor is further stabilized, will

---

64. Honesty requires a recognition: the 8% operating margin, and the enjoyment of it that any recipient of interest or dividends would have, would be built on the backs of the Debtor's employees—and many of them do not have much in their personal cash flow to spare toward that. That fact is unsightly, and no one can reasonably deny any employee's reaction of outrage. But like it or not, recognize it or not, the outcome on this point is an inescapable product of the very dark and deep straits the Debtor is in.

65. The Court expressly reserved the issue of whether MAIR could or would provide exit lending or further investment, when the unions' drive to pursue the fraudulent transfer theory was halted before the commencement of discovery. As recognized then, the question is whether the essential fact underpinnings could be proven: that MAIR would be ready, willing, and able to disburse the money when the need came, and would commit to doing that. Given the parties' posture, the proving of that fact promised to be a dicey undertaking. And it was.

MAIR's officers and board undertake any focused action to further support the Debtor's operations, pre- or post-confirmation.

In context, there is every bit of credibility to this statement of position. MAIR is cash-rich. If one thing may be said with utter certainty in all this, it is that MAIR's shareholders (and the securities-law counsel who represent them or would like to do so) will watch very carefully what MAIR's management does with that largess. There is evidence of record that the securities market does not put material value on MAIR's shareholding in the Debtor: the aggregate market price of the outstanding shares in MAIR was not greater than the value of the raw cash that MAIR presently holds, when that evidence went into the record for this motion. So at present, absent a material change in the Debtor's circumstances, there does not seem to be much of a choice for MAIR, insofar as extending credit on a long-term basis or making further equity investment in it.[66] And with that, it becomes academic whether MAIR would have some sort of undeniable and irresistible motivation to fund the Debtor's exit from Chapter 11 on better-than-market terms.[67] Thus, it cannot be found on this record that MAIR presents an avenue of post-confirmation funding at a cost that would render the Debtor's proposed labor cost reductions unnecessary to reorganization.

### d. Imposition of Six–Year Duration for Reduced Labor Costs.

The fourth challenged aspect of the Debtor's proposal has some of the nature of an "assumption" to underlie the business plan and some of the aspect of a functional term of the plan itself. The Debtor proposes to impose its labor cost reductions on the unions for a term of six years, without possibility of renegotiation during that time. For the height of emotion characterizing the unions' opposition to it, this point ties with the target of operating margin. It is understandable that that is so; outside of bankruptcy, and under a mainstream application of the Railway Labor Act, it would be asking far too much of unionized employees to take deep cuts in in-hand receipt of wages, and to be bound by that for over half a decade.

But the matter at bar is in the context of bankruptcy, and the Debtor in this case has less direct control over its destiny than almost any other airline-debtor.[68] The Debtor must maximize its projection of fiscal stability in order to make its case on bidding for work from mainline carriers. There is sufficient proof in the record to support a finding that six years of anticipated predictability on the level of labor

---

66. This observation was borne out by a development in this case that occurred after the closing of the record for this motion: MAIR did not renew its commitment to provide debtor-in-possession financing beyond its last extended expiration date of March 31, 2006. After that, the Debtor withdrew its pending motion for authority to incur that secured credit. It is now casting in the open market for interim financing.

67. This lays to rest, at least for now, the nagging doubt about just how the unions expected to get anywhere toward their ultimate point, even if they proved up the likelihood of an economic motivation in MAIR. There would have been no way under the law to *compel* MAIR to lend or invest. In order to really defeat the application of a market-oriented frame of reference, the unions would have had to get a ruling to the contrary on that point.

68. The one case possibly more severe would be that of a *de jure* subsidiary-regional that has its network carrier also in bankruptcy. As the parties noted through their proof, there is one such case right now, that of Comair, Inc., a subsidiary of Delta Air Lines, Inc.; the reorganizations for both of them are presently pending in the Southern District of New York.

costs will most enable it to do that, and will best promote its long-term financial health by increasing its chances of winning such bids.[69]

At this point, the unions' insistence on "snap-back" provisions is best addressed. As described by several of the unions' witnesses, such a term would provide for an automatic restoration of pre– § 1113 wage or benefit provisions if the Debtor's operations returned to a state of solvency sufficient to fund them, or for a reopening of negotiations on these terms upon a designated level of improvement in the Debtor's financial condition.

Given the Debtor's position as a regional airline on a "fee-for-departure" arrangement with its network carrier, however, such provisions would be futile with the way the mainlines are currently dealing with prospective regional airlink partners. For the foreseeable future, the circumstances for a traditional triggering of "snap-back" are very unlikely to come about as a matter of fact. Financially-pinched network carriers will extract economies of scale from those regionals with which they choose to contract. Further, with the possibility that "snap-back" provisions bring about substantial uncertainty over labor costs in the early stages of a new ASA, a term for the reopening of compensation issues in bargaining or "interest arbitration" could destabilize the Debtor's performance under a secured airlink arrangement. Beyond that, with the

prospect of interruption of service, it could even chill the interest of any mainline in contracting with the Debtor for such service.

Snap-back provisions clearly lessen the unpalatability of employee concessions. They even create an incentive to employees for more efficient production. However, the Debtor's unions have not made a case that they would be fruitful in a larger sense, under the conditions that have taken over the regional airline industry. The Debtor has presented evidence just persuasive enough that their presence would hinder the regaining of business volume in the stabilization of the Debtor's operations. All told, then, the Debtor's management is not out of bounds in wanting to avoid any sort of snap-back provision. Their omission from the Debtor's proposal does not render the included modifications unnecessary to permit the Debtor's reorganization.

### e. Reliance on Specific Pattern of Employee Attrition.

██ The unions' fifth objection may also be said to rest on an assumption of fact, in relation to the effect of the workforce reduction the Debtor is currently undergoing due to the fleet reduction occasioned by Northwest. The Debtor calculated the projected cost of employee compensation, specifically wages, projecting that its unionized workforce after the downsizing would consist of the most-tenured—and hence highest-salaried—em-

---

69. Among other things, there is unrebutted evidence that all of the major legacy carriers and several regionals that have gone through Chapter 11 in this decade *have obtained unions' consent* to concessionary labor cost structures for durations in time that compared to the term that the Debtor has proposed. These include Northwest (six years, ALPA, concessions just ratified by the membership); US Airways (five years); United Airlines (six years); Allegheny Airlines (seven years); Hawaiian Airlines (six years); Midwest (six years); Piedmont (later U.S. Airways, six years); PSA (seven years); and Express One (later Pinnacle, Northwest's other airlink partner, seven years). It stands to reason that a network carrier would look most favorably on an airlink partner that could promise similar stability, and that the assurance of that could help to quell doubts over the stability of a regional that was in or emerging from Chapter 11 itself.

ployees in each union group.[70] Thus, it calculated a projected total cost of post-downsizing wages by using those specific employees' wages, which in total clump at the upper end of the Debtor's wage structure. The annual total of wages payable to this specific complement of employees was then added to the cost of benefits and other labor-related expenditures, and that figure was then compared to the residuum of necessary cost reduction to arrive at the 19.4% target reduction in all labor costs. This target factor was then applied to the aggregate labor cost for each union group to arrive at the annual reduction of costs in dollars that the Debtor would seek from each union. After the dollar-value of non-wage reductions was credited, the balance was then factored against that total of assumed post-downsizing wage costs, to arrive at the percentage by which each pay level's rate of compensation would be reduced when the Debtor's proposal was implemented.

The underlying assumption for the composition of the ultimate workforce, however, was that the membership of each union group would be winnowed down in the aggregate, by voluntary quit or by furlough according to collective bargaining agreement, but that these two means would coincide 100% on the lower-tenured employees.

The unions take strong exception to the Debtor's methodology on this point. They insist that the underlying assumption is neither reasonable nor realistic. Their conclusion is that it resulted in an inflated factor for the reduction of wages, contrary to the case law's dictate of no more than the modification consistent with a return to longer-term financial health. AFA presented the opinion of Daniel Akins, its

expert on costing, to the effect that a more "normal" incidence of attrition, with voluntary departures by employees up and down the wage levels, was much more to be expected in the course of the downsizing. With this pattern, Akins maintained, the extraction of a component of more highly-paid employees from the surviving workforce would result in a lower overall cost of wages post-downsizing but pre-modification, and ultimately in a smaller percentage reduction in rate to arrive at the target dollar-value of wage reduction.

Under cross-examination, the Debtor's several witnesses were put to the task of defending their assumption on the pattern of attrition. They were not able to cite any scholarly study that they had relied on, or practical experience by the Debtor or any other airline. Ultimately they came up rather short on external specifics to justify a possible turn of events that seems counterintuitive in the pervasiveness of the *individual* behavior that it assumes. Nonetheless, as they suggest, there was an available defense, albeit more in the abstract: a conservative projection of the downsized outcome should assume a most-extreme-case scenario—in which the seniority rules so zealously guarded by the unions might have to be applied across the board in furlough, if no union member indeed left the employ on his or her own.

Both sides' presentations on this point were far too cursory. Neither side brought forward support in empirical research on general workplace patterns, in this industry or otherwise. A choice between them would require a consideration of imponderables, and an election that would neither appear nor be principled and objective.

70. The Debtor's collective bargaining agreements all provide for longevity increases in wage rates, effective annually.

Ultimately, the Debtor's actual experience with attrition and downsizing this year will depend on the cumulation of individual decisions by dozens or hundreds of persons. Each one of them will have a unique set of motivations. It is not inconceivable that long-tenured and relatively well-paid pilots, flight attendants, or mechanics would leave, whether to take the same position with another airline,[71] a different job entirely, or even for a break to reevaluate life goals and prospects.[72] The Debtor's assumption, hazily based as it is, just does not take account of any of these permutations. On the other hand, one cannot attach very much weight to Akin's blithe suggestion that an attrition pattern "typical" for a time of normal operations would replicate now, in very atypical circumstances of near-crisis and during a most unsettled time in the industry.

There is a solution to this quandary, which can be transplanted right from the Debtor's proposed treatment of a like conundrum for one of its non-unionized labor groups. When queried about what would happen if the Debtor's projection of attrition incidence for management and administrative employees did not play out by the effective date of wage reductions, Schmidt stated that there would be a "true-up" of the factor for wage reduction that would be based on the actual workforce composition at the time as compared to that assumed for the term sheet's calculations.

The percentage cut of compensation would be increased, if that was necessary to achieve the overall target reduction for this labor group as then staffed.

This mechanism would be a way of fine-tuning a reduction in wage rates to reflect the cost of working with the unionized employee contingent that the Debtor would actually be left with. If the incidence of voluntary quits occurred among more highly-tenured employees and is significantly higher than the zero-factor assumed by the Debtor, there could be a material effect on the outcome of the analysis. For that reason, it would bring the percentage factor for reduction into line with what is statutorily necessary, without pushing the modification into an excessive invasion of union members' past entitlements. Overall, the drop in the percentage rate might turn out to be no more than a point or two. But, nonetheless, fair is fair.

The Debtor's proposal did not include a mechanism like this, relying instead on a blunter instrument that is likely to exaggerate the impact of labor cost reduction on individuals. To respond to the balance of values that should characterize any proposal under the necessity element, the proposal should do so. At the very least, the Debtor should have to explain in detail why a "truing-up" could not be done for the unionized labor groups in a fashion

---

**71.** There was no evidence as to the financial attractions or detractions of doing so, other than some testimony to the effect that such individuals would have to "start over at the bottom" of a new employer's wage structure. (Apparently this would be due to cognate tenure provisions in collective bargaining agreements with unions that are common to several airlines.) In a given case, however, that structural circumstance would not matter as much as the *amount of wages* at that level, as compared to that left behind in a higher-tenured position with the Debtor. (Of course,

the relative security of the new employment, as opposed to the Debtor's ability to give that, would factor into the mix for any individual's decision too.)

**72.** Some employees, when presented after long service to the Debtor with a drop in income of the magnitude the Debtor is suggesting, might just decide "I've had enough"; and, if having the personal means to get by financially, would just take a personal time-out.

that would be financially futile and legally sustainable.[73]

For this factor, then, the Debtor's proposal fails on the "necessity" element of the substantive requirements of § 1113(b). However, this can be remedied.

*f. Weighing the Role of "Inducements."*

The unions' next objection is somewhat more broadly based. It is that "the proposed modification [sic] are not necessary given the role of 'inducements.'" The circumstances cited to support this are a haystack of disparate fact allegations, centering around the accusation that the Debtor propounds "be[ing] the low bidder" as the sole way through which it would be able to land additional regional flying from Northwest and other network carriers.[74]

The argument here is apparently that the "inducements" that mainlines have taken to soliciting from regional carriers play such an important part in the competition for airlink flying that a regional like the Debtor need not structure its costs to fashion the lowest bid, or even an especially low one, to remain in the running or even to win.

As a matter of fact, this objection is completely without merit. There is plenty of evidence on this point, from the witnesses who are currently involved in the contracting of regional flying, and in particular the Northwest executive noted *supra* at p. 732. All of it establishes that Northwest tries to run the bids of all competitors for regional flying down to a close range of numbers that are as low as it can justify on the operating economics. *Then* it opens up pressure to "sweeten the pot" via the tender of inducements, from each bidder itself or from a related third party. The sole possible implication is that if operating expenses, *including labor costs*, are not set so as to minimize the amount of the initial, "raw" bid, a regional carrier vying for an award will not even get to the point of being hit up for inducements. The regional's general operating cost structure gets it to the position of being asked to make further concessions to a prospective network airlink partner, in a lump sum or other extrinsic form. Inducements do not drive the process of an award of airlink flying, as much as they may clinch it in the end. The Debtor's proposal, with its labor cost reduction of the depth sought, therefore does not fail the necessity test for its failure to contemplate the contrary.

*g. The Prospect of a Strike or Drastic Loss of Staffing.*

■ The unions' last objection on the necessity element is that the Debtor's pro-

---

**73.** There may be a complication in the framing of a true-up for union members, depending on timing. Obviously, a true-up is to be performed as of a fixed date. The most defensible one would be when the workforce actually reached its end-number, after the experience with the mix of voluntary quit and furlough had ended. Since the Debtor's downsizing will not end until the final Avro is removed from service, seven-plus months from now, those processes could go on a while longer. Yet, the Debtor insists it has to make the actual cuts to labor costs sooner than that. The solution may lie in setting a deadline for voluntary quit, identifying the subjects of furlough then, determining the workforce composition as it would result, and then doing the true-up calculation of the wage cut. This is still a blunt instrument, not sensitive to the fact that higher-tenured employees might voluntarily quit between then and the attainment of steady-state fleet size. But it is still more responsive than flipping the coin between two opposing unknowables.

**74.** The other cited circumstances stretch out to a gratuitous proposed finding that "[t]he relationship between [sic] Mesaba, MAIR, and Northwest is a less than arm's length relationship." This stretched and loaded pronouncement is placed into the unions' post-trial submission in a rather elliptical position. And the unions' showing was far, far from enough to merit the making of a finding with such huge implications.

posal "do[es] not recognize the potential that [it] would actually lead to liquidation."

As the unions see it, the liquidation of the Debtor would necessarily follow a cessation of operations, which would be brought about by a strike that the three unions could call in response to rejection and imposition. In the alternative, the unions predict the possibility of a "mass exodus ... among either the pilot or flight attendant ranks." By that, they mean a situation of employees voluntarily quitting en masse, in such numbers that the Debtor could not make sufficient new hires of qualified applicants in time to staff its flight schedule. Thus, the unions argue, the Debtor would have to curtail or cease operations, and then be liquidated.

The unions did produce testimony from officials in all three locals. They all stated that they believed that their leadership had gone through the necessary steps to authorize them to call a strike; that they had resolved to do so if this motion were granted and the Debtor imposed its terms; and that the membership was poised and ready to act on that by work stoppage, if the prerequisites came to pass.

These prospects, the unions say, render the Debtor's proposal not necessary to promote reorganization. Apparently the underlying logic is that reorganization is not to be possible if they go forward to strike, or if the Debtor is reduced below a working complement of staff.

The underpinnings of this argument are quite obscure. In a way, it is almost embarrassing to see it presented in a forum that is to receive principled discourse structured by the dictates of reason. In contrast, this seems to be a matter of posturing only, and posturing in the height. One message to be gleaned from it is jarringly out of place in a legal proceeding: "If you don't watch out, I'm really going to hurt myself, and you, too." An image comes to mind, of standing under a high bridge, and hearing a voice coming from above: "If you don't give me what I want, I'm going to grab you and take us both over the edge!"

In point of fact, the *power* to conduct a strike rests solely with the unions. That is where the impetus for one must lie—and, too, the attribution of any consequences.[75] To raise the threat as an ostensible and compelling reason to deny the motion is truly ignoring the plank in the eye for the splinter in the finger, if the thought is that above all else it is "necessary" for the Debtor to continue operations.

The Debtor has made its case, that its operations will not be able to continue on the current cost structure, including labor costs. That is the situation that all of the constituencies must deal with. The whole apparatus that has accreted around the legal frame of § 1113 gives a process to deal with it. Under the facts as established, the motive force for that process should be the anticipation of a mounting bleed-out under the current cost structure, or a catastrophic hemorrhage with the loss of blocks of flying business. But threatening to cause a catastrophe in the wake of one outcome to the § 1113 process, and then saying that the making of the threat should conclusively deter that outcome,

---

75. This all presupposes that the unions have the legal right to strike in the wake of a court-authorized rejection and imposition. The parties have already pushed forward the issue of whether bankruptcy law or the Railway Labor Act would bar a strike in that situation. Both sides have submitted some briefing on it.

The invitation to take up that one in the context of this motion is denied, however.

Above all else, the issue simply is not ripe, as Article III of the United States Constitution requires before this Court may take cognizance of it.

elevates a bullying tactic to a mask over the underlying problem. There is an aura of self-righteousness and self-possession here that borders on solipsism. And, ultimately, would the threatened outcome *really* be in the best interests of the regular working people who make up the unions' locals? [76]

Underlying all of this is a veiled suggestion that the Debtor somehow has so trumped up a plaint under § 1113 that the unions deserve the vindication of calling a strike. After multiple contentious preliminary hearings and a bludgeoning 15–day evidentiary hearing, no one could be convinced that the Debtor would buy that kind of trouble.

So in short, there is no logical link between the possibility of strike and the necessity element of § 1113(b) as it applies to the Debtor's proposal.

The matter of a possible "mass exodus" via voluntary quit is neither as affrontive in tone nor as devoid of logic. It cannot be denied that the Debtor faces this as a possible future. And, depending on the cumulation of many individuals' decisions over the coming months, the Debtor might find itself unable to comply with FAA staffing and safety regulations, and thus prevented from flying. ·

But, ultimately, this argument has the same fate as the one that invokes a strike. That is so even if the possibility of "mass exodus" is more appropriately characterized as a value-neutral business risk to which the Debtor is exposing itself, rather than a threat of injury from opponents heedless of the jeopardy put to their own constituents. The Debtor is willing to assume that risk. Even though its executives profess to have no overarching contingency plan to deal with a dwindling of staff that is beyond its control, this does not make the possibility logically relevant to the necessity of the Debtor's proposal.

This objection, frankly, was unworthy of the making. If the specter of a strike or the possibility of a depopulated workforce had any relevancy to the Debtor's proposal, they really had no place in being raised under the necessity element.

This covers all of the truly significant arguments raised by the unions under the necessity element.[77]

### 4. Fair and Equitable Treatment.

▇▇▇▇ *American Provision Co.'s* fourth element requires the proponent of modifications, through their terms, to "assure[ ] that all creditors, the debtor, and

---

**76.** Another court said it, so plainly and simply that it is "elegant" in the sense of a mathematical proof:

> A strike is an inherent risk in every § 1113 motion, and in the end, it makes little difference if the Debtors are forced out of business because of a union strike or the continuing obligation to pay union benefits to avoid one. The unions may have the legal right to strike, but that does not mean that they must exercise that right. The union's right to strike carries with it the burden of holding the fate of the rank and file in its hands. Little purpose would be served by a strike if a strike results in the termination of operations and the loss of jobs by the strikers.

*In re Horsehead Indus., Inc.,* 300 B.R. 573, 587 (Bankr.S.D.N.Y.2003).

**77.** There was one more, which went to the inclusion of a number of changes to "work rules" in the Debtor's proposal. The unions maintain that these changes "provide no economic value and thus are not necessary," insisting that the Debtor did not establish a quantifiable value for them as a matter of fact. However, it was not the Debtor's burden to do so. Where enhancement of productivity will promote long-term financial health in addition to the bolstering of raw cash flow, the inclusion of work rule changes in a debtor's proposal does not make it fail the necessity requirement. *In re Int'l Union, UAW v. Gatke Corp.,* 151 B.R. at 214.

all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). This is one of those on which the debtor-in-possession has the burdens of production and persuasion. 44 B.R. at 909–910. As the Second Circuit noted in *Carey Transp.*, this requirement serves to "spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree." 816 F.2d at 90. It does not require the proposal to give every constituency the very same treatment. *In re Walway Co.*, 69 B.R. at 974 ("a comparative dollar-for-dollar concession" is not mandated by fairness-and-equity requirement).[78] For the application of § 1113(a)(1)(A), "equity means fairness under the circumstances." *In re Indiana Grocery Co., Inc.*, 138 B.R. 40, 48 (Bankr. S.D.Ind.1990).

In the case at bar, the Debtor was not required to see that managers and non-union employees would have their salaries and benefits cut to the very same degree as proposed for union members. *Carey Transp.*, 816 F.2d at 90. Nonetheless, it proposed to subject *all* of its labor groups to the same reduction of 19.4% of aggregate costs related to their employment.

Management-level employees' compensation is being reduced both as to their base salary and as to the incentive pay that is a standard form of executive and managerial compensation in the industry. Unlike the union employees, management employees will have no valuation attributed and credited to modification of "work rules"; the larger brunt of their cut will be taken against compensation that is directly valued in dollars.[79]

■ The terms of the Debtor's original proposal did not provide for reductions to each union group's wage rates in equal percentage, because of the initial crediting of labor cost reductions attributed to work-rule changes. However, the "fair and equitable" requirement is not violated by disparate percentages in proposed cuts to the wages of employees of different unions. *In re Indiana Grocery Co., Inc.*, 138 B.R. at 42; *In re Texas Sheet Metals, Inc.*, 90 B.R. at 270; *In re Allied Delivery Sys. Co.*, 49 B.R. 700, 702–703 (Bankr.N.D.Ohio 1985).

Finally, the Debtor's proposal would subject all employees, unionized and non-union, to the same increase in individual contribution to the cost of premiums for

---

**78.** As a matter of semantics, this is inherent in Congress's choice of wording: "equitable" rather than "equal."

**79.** As the unions appropriately developed in cross-examination, many of the Debtor's proposed modifications to work rules under their collective bargaining agreements will result in lesser accrual of actual pay to union members. Thus, as they point out, the shifting of emphasis in some of the Debtor's post-motion proposals from percentage wage cuts to deeper modifications of work rules ends up being a zero-sum game, insofar as impact on individuals' pocketbooks. The unions' insinuation was that the Debtor was fooling no one in doing this, and should not have tried to. To effective rejoinder, the Debtor's counsel have never made any bones about how it will all have to factor out to the same dollar-amount in the end, wherever it comes from.

As long as we are in the game of "outing" the respective sides' positions, another observation is appropriate for the parties' reflection. The Debtor's emphasis on the weighting of management's cuts has another side to it: even when management employees have individual written contracts of employment, they certainly do not have the multi-fold limitations on work-day length and shift sequence, pay enhancements for hours worked outside of week-day daytime, etc., that unions have accreted for their members' enjoyment over the decades of organized labor's influence. Over the last quarter-century, American executives have been put under increasing demands of much longer hours and greater stress, without changes in their compensation structure that can be directly identified to that.

company-sponsored health benefits, from 25% to 50%.

In their post-hearing submissions, the unions did not make any frontal assault on the overall structure of the proposed cuts, as they were to be applied across the Debtor's workforce. Further, there was no pitch that high management employees, directors, and officers should have to take a much more substantial percentage cut in their compensation, under some idea that their wages were high enough that they could bear it better.[80] Rather, the unions focused their objections under the fair-and-equitable requirement to four specific complaints. Of them, only one deserves really extended discussion.

### a. Reduction of Wage Rates to an "Industry–Low Compensation Structure."

■ Branding it as a badge of lack of fairness and equity, the unions pointed to the specifics of the Debtor's first proposal, down to its numerical gradations of compensation rates within each union group over the seniority progression. The unions insist that these terms "would reduce wages to the bottom of the industry."

The testimony of the unions' expert witnesses did bear out this accusation as a matter of comparison, for numerous and varied levels of seniority in the various positions. The cuts in wage rates as originally proposed would indeed put the Debtor as one of the very lowest-paying regional airlines in the United States, for most of the levels of seniority in the several unionized job positions.[81]

■ As many corollary consequences as this could have,[82] the point simply does not go to the requirement of § 1113(b)(1)(A), which is that all constituencies *within the case* receive fair and equal treatment *as among them*. By its very wording, the element requires a comparison among those groupings. The analysis does not run between each such group within the Debtor and its correspondents in the employ of other airlines, and certainly not against a more general notion of what is just, fair, or "ethical" to be afforded to the employees whose labor sustains an enterprise.[83] In our free-market system, those values can and often should serve as a tempering factor in managers'

---

80. It was prudent not to raise any objection based upon notions of "class" stratification by income or even labor group. There is enough discrepancy between top pilot wages at the Debtor and the beginning wage rate for flight attendants that the argument could have been directed back, to create fractures between and within the unions.

81. On cross-examination, several of the Debtor's experts and fact witnesses were forced to acknowledge this.

82. One could envision a substantial decay of the Debtor's ability to attract new employees of quality, if the airline industry is not operating in a labor-surplus environment for its specific needs. In turn, if the Debtor had to troll from a pool of less desirable applicants, its reputation for high quality of service provision could suffer greatly, with possible jeopardy to its ability to attract new business.

83. This legal conclusion renders surplusage of the ultimate opinion of Amy Alperi, ALPA's in-house Lead Economic Analyst, as to the fairness and equity of the Debtor's proposed treatment. She opined, in an unadorned fashion on cross-examination, that the magnitude of the proposed cuts to the pilots' pay, and really nothing more, made the Debtor's proposal "unfair." The testimony on this issue given by Ana McAhron–Schultz, the Director of ALPA's Economic and Financial Analysis Department, met the same fate on cross-examination. Her opinion was that "up to a 65% reduction [in pilot pay] was just not a reasonable thing for people to ratify," and "the focus on the labor cost side" rendered the Debtor's proposal unfair and inequitable in general.

decision-making. Our society should salute executives who are responsive to these ideals when their companies' means permit them to be. But in the last instance, every company must respond to the market, and must compete within it as it is able. In that, its ability to find solutions is subject to the hobble of real-life circumstances. Here, those include the heavy weighting of tenure within the Debtor's actual workforce, at the upper ends of compensation levels. This results in the high per-capita labor cost that the Debtor has, a simple part of the landscape with which the Debtor must cope in its restructuring—against competitors that would have a materially lower per-capita labor cost for the very same work that the Debtor hopes to land.

To their credit, or perhaps only in prudence, the Debtor's managers are abiding by the seniority principles at the core of its collective bargaining agreements, and they are carrying them forward in governance. On the assumption that the post-downsizing workforce will continue to have a significant component of higher-paid employees, they built the proposal. The mathematics entailed with those aspects of the business plan are straight-forward and undeniable, and their working-out is inexorable. Those at the lower end of seniority, particularly among the flight attendants, will be reduced to a very low wage rate in the absolute, if any remain in the Debtor's employ after the downsizing. Those at the upper ends will be very low-paid, as compared to their colleagues elsewhere in the industry.

Insulting, this certainly can be perceived as; and personally threatening, no question at all. But unfair and inequitable, in the established context of Congress's judgment under § 1113(b)(1)(A)? Sadly not, within the universe of parties that the statute establishes as relevant—which are the other labor groups employed by the Debtor.

### b. Far Greater Wage Reductions to be Imposed on Particular Pilots.

 In a comparable vein, ALPA's members bridle at the outcome for a group of individual pilots that they say would result, when the Debtor's fleet is reduced to its steady-state size and composition of 49 Saab turbo-props under the business plan. They state that certain individual pilots will experience actual reductions in wage rates of up to 65%. They posit this as a badge of just how lacking the Debtor's proposal is in fairness and equity.

The Debtor does not deny that some individuals could suffer this very impact by early 2007, if they remain in the Debtor's employ and if the Debtor does not land the CRJ flying from Northwest. The root cause lies in the fact that Avro pilots are more highly compensated than Saab pilots, and the more highly-compensated regional-jet flying is more desirable within the pilot community. The rules for "bidding into" openings for particular flying under the ALPA collective bargaining agreement give priority to more senior employees. As a result, the existing staffing of Avro pilots with the Debtor have higher average seniority than the existing component of Saab pilots. As the Avro fleet is phased out at Northwest's instance over this year, its pilots will be reassigned to Saab flying if they wish to keep their employment with the Debtor.[84] This will proceed according to the seniority principles of the ALPA collective bargaining agreement. Further complicating the process is the fact that captain and first officer positions are hierarchically compensated, and seniority principles may require some captains on Avros to be bumped down to first-officer status in the Saab fleet.

---

84. This will result in the least-tenured Saab pilots being "bumped" into furlough.

The necessary correlate is that these reassigned pilots will have to accept Saab-level wages, and possibly reassignment to the first-officer status that is the least-compensated of all four grades between the two types of craft. That furthest fall apparently could produce the reductions of "between 56% and 66%" of wages that ALPA highlights, for specific individuals.

Unfortunately for ALPA's members, this circumstance does not make out an objection under the fair-and-equitable requirement. As repugnant as it is to qualified, experienced, and loyal professionals that some of them may have to go through this, the source of their enhanced loss is not within the Debtor's control at all. The root cause of the enhancement loss is Northwest's withdrawal of the Avros from service. Given that, the mechanics of their loss are inherent in the seniority structure and the pay differentials that are in the very collective bargaining agreements that ALPA agreed to. The Debtor is honoring those terms in the transition. So the statutory concept of fairness and equity has no relevance to the greater loss that these individuals would go through.

### c. Terms of Proposed Profit–Sharing Plan.

The unions' third objection on the requirement of fairness and equity is that the terms of the Debtor's proposal for a new profit-sharing plan for employees fail on these considerations.

Until now, the Debtor has not had a profit-sharing plan for employees, as such.[85] It is proffering one as part of its § 1113 proposal. It justifies this as a means to give continuing employees some right to share in an "upside" if the Debtor survives this case and is able to reestablish a profitable operation.

Contrary to the general tone of the unions' response, there is no reason to doubt the good faith of the proffer. And there is no reason to besmirch the sincerity of management's wish to extend a modest and deferred offset of the drastic reduction in current compensation under the Debtor's proposal. Beyond that, the unions take exception to aspects of the plan's structure, and they insist that these fail § 1113(b)(1)(A).

The first is the fact that the plan would offer "no guaranteed return to [the Debtor's] employees," and that the projected distributions to the plan toward the end of the ten-year duration of the business plan do not "sufficiently reward ... employees for the approximately $50,000,000.00 in up-front investment that they will be asked to make in the form of concessions ..." The second is that deposits to employee accounts under the plan would be made from profits that would be recognized only after operating losses carried forward from earlier years were offset in full.

Setting aside the substantive shakiness of these points,[86] it must again be said:

---

**85.** It has had several varieties of incentive plans for union and non-union employees (the latter somewhat erroneously and inflammatorily tagged by the unions as a "bonus plan" for executives). The entitlement to awards under these programs depended on individual performance evaluations as well as the company's means to make payment, and the amounts disbursed were not based on a pro rata share of a bigger fund that would vary in size on the Debtor's current success.

**86.** Precious little was put into evidence regarding the standard form and operation of profit-sharing plans, but some observations can be made on the general understanding of them. Profit-sharing is usually justified on management considerations as the grant to employees of a stake in the company's success, creating an incentive to greater efficiency in workplace performance. The inclusion of a minimum entitlement or "guaranteed return" cuts against this thought. In any event, the unions did not cite any examples of a

they have nothing to do with the fairness and equity element. The terms of the profit-sharing plan are the same for all employees, and necessarily for all affected constituencies within the Debtor. That being so, this element is not a platform for attacking their internal merits.

### d. Lack of Written Commitment to Duration from Management and Vendors.

■ The unions' last objection on the fair-and-equitable requirement was one tenaciously and emotionally advanced during the evidentiary hearing. It stems from the fact that the Debtor's proposal would bind union members to the modifications, in particular the reductions in wage and benefits, for a full six-year term, as a written commitment. The Debtor has represented and "pledged" that all management employees, officers and directors, and non-union employees would be subject to the proposal's reductions for the same period of time. However, the managers, officers, and directors have not set that commitment down in writing for themselves, and now state that they will not do so.

As much as this argument resonates with a simple gut-level sense of "what's right," it is just not sustainable given the nature of its focus. One reason is retrospective in orientation and the other is prospective.

The basic nature of management employees' connection with a corporate employer is in relevant respects fundamentally different from that of union employees. This is particularly so in the nature of tenure and individual job protection and the maintenance of employment terms like the level of compensation. A collective bargaining agreement gives unionized employees long-term assurance of job retention and protection of income and benefit levels. As bolstered and promoted by generally-applicable labor legislation, it creates remedies for deprivations of these entitlements, and complicated processes and forums in which to exercise those remedies. It creates a relatively safe and stable environment for its beneficiaries, as long as the employer retains its own functional integrity as a going concern capable of performing under the collective bargaining agreement.

By contrast, management employees, even when covered by individual written contracts of employment, do not have comparable protections. They have the benefit of contractual remedies, asserted in courts of general jurisdiction, and the protections of various bodies of law, chiefly the statutory prohibition of workplace discrimination and common law redress for wrongful termination. But they do not have any strong legal basis to resist a proposed reduction in compensation if that is represented to be the only alternative to involuntary separation due to the employer's economic distress. And, particularly at upper levels, executives' marketability for attractive future employment, not to mention personal reputation, can depend

---

minimum-entitlement term within the airline industry or without. As noted on the record during the evidentiary hearing, terming the admittedly-unsavory concessions the Debtor is asking of employees as an "investment" in the company is a rhetorical flourish, but it is not technically accurate and cannot trigger all the technical implications of the term. And the use of a loss carry-forward as part of the basic mechanics of the plan seems to be more responsible than predatory. In an industry more subject to turmoil and the impingement of multiple unexpected contingencies than most, the assurance of basic survival has to take primacy. So, recoupment from a bad year, before distribution to an employee benefit plan from current largess, seems the only prudent thing to do. In that instance, there is nothing to fear by way of a shareholder getting the first grab.

on voluntarily retaining a job under such adverse circumstances, to fight to keep the enterprise alive with all the risks that entails.

There is just a different dynamic in the employer-employee relationship as between the two, and a fundamentally different set of expectations and expectancies. Even if a subordinate manager's written contract specifies minimum compensation levels, the personal vulnerabilities of her position may dictate forgoing that protection to retain both employment and personal professional profile. A union member need not do so; and the operation of the culture of institutionalized management-labor relations almost invariably means that union members do not.

If under its business plan the Debtor's post-confirmation operations hit another rough patch, there is nothing to say that its managers, officers, and directors would not have to take further voluntary reductions in compensation, nor that they would not do so in fact. A number of them have done so in the relevant past, for the material or symbolic effect that such actions had.[87]

It is inherent in the nature of unionized employment that terms be binding for fixed periods of time. The same thing is not inherent in the nature of the employment of managers, officers, or directors.[88] Because of that fundamental difference, it does not defeat the fairness and equity of the Debtor's proposal that managers would not be required to execute the written commitment that the unions demand.

The other reason looks forward. Though nobody framed up the point, it jumps out from the facts as presented.[89]

The unions never specified whether this commitment was to be made by present management personally, or by the Debtor to apply generally to present and future-hired management employees. If the thought was for the latter, the measure could have very unfortunate consequences on a foreseeable turn of events.

If a key executive or executives presently in the Debtor's employ left post-confirmation, and the Debtor were in dire financial straits again, there would be a need to attract the best talent available to confront the crisis. If the Debtor were under the constraints of a written covenant with its unions not to compensate *for that position* above a fixed level, it could very easily find itself not able to hire to meet the need. In that event, a measure that was possibly sparked by a very personal animus toward specific persons heading the Debtor at present could contribute to bringing everybody's employer right back down in the future. For that reason, if such a measure were to be binding on the Debtor for all management positions, it simply would not promote the long-term financial success of the enterprise.

The unions cited other points under color of their attack on the fairness-and-equity element. But those either are inappo-

---

87. The unions brought forward no evidence to contradict the testimony of several of the Debtor's executives to this effect.

88. Formal written employment contracts may provide for minimum durations for the relationship and its terms; but absent them there is no source of "law," private or public, that gives such protection to management employees.

89. Its absence may be a product of the fact that the objection was so single-mindedly propelled on a personalized animus. That character was evidenced by the statement of AFA.'s counsel that this issue had to be pursued because if it was not, the Debtor's executives would "give themselves" a large increase in salary right after an emergence from bankruptcy, "just like they have in other cases."

site or inconsequential, or have been treated in the discussion of other elements.[90]

So, in the end, the Debtor's showing under the fourth requirement of *American Provision Co.* is sufficient.

### 8. Lack of Good Cause in Unions' Refusal to Accept Debtor's Proposal.

■ As its eighth required showing under *American Provision Co.*, a debtor-in-possession must prove that the union "has refused to accept [the] proposal without good cause." 11 U.S.C. § 1113(c)(2). After "the debtor has shown that the Union has refused to accept its proposal the Union must produce evidence that it was not without good cause." 44 B.R. at 910.

Here, the Debtor has obviously satisfied the minimal burden it bore under the *American Provision Co.* formulation.[91] The interesting thing about the burden ostensibly imposed on the unions is that the result will almost invariably be compelled by the sum of the analysis performed up to this point: if a debtor-in-possession goes through the procedural prerequisites for its motion, and if the substance of the proposal ultimately passes muster under § 1113(b)(1), its union(s) will not have good cause to have rejected the proposal.

■ So what has to be said here is actually rather short, and quite obvious. The Debtor's unions had good cause to reject its proposal to the extent that the Debtor had not given them the informational wherewithal to raise their comfort level to an acceptance of the core of the proposal, the 19.4% overall reduction in labor costs that the Debtor's financial straits compelled. Insofar as the proposal contained a few provisions that have been held substantively lacking in this order, the unions did have good cause to oppose the Debtor. Given the outcome on this motion as to the remaining substance of the proposal, they did not have good cause to reject or oppose the Debtor on that account, or to maintain that position to the point of litigating these issues at such length.

So, for those confined reasons, the Debtor lacks the satisfaction of this element, for the first proposal and on this motion.

### 9. Balancing of Equities Favoring Rejection.

■ The ninth-and-final element under *American Provision Co.* requires the proponent of rejection to show that "the balance of the equities clearly favors rejection of such agreement." 11 U.S.C. § 1113(c)(3). The debtor-in-possession has the burdens of production and persuasion on this element. 44 B.R. at 909–910.

The placement of such a requirement into its context is a bit peculiar. The preceding text of §§ 1113(b)-(c) establishes an exacting series of procedural hoops and substantive requirements. The latter need proof of complex facts, and thus they may be analogized to an extended set of elements for a cause of action *at law.* Then, however, we have the overlay of a consideration of *equity,* the body of jurisprudence that allows the strict consequences of an application of law to be overridden when that does not seem to be the "fair"

---

**90.** Specifically, these points went to the difference in assumptions of attrition as between management and unionized employees; the deficiencies of the Debtor's provision of information in light of the magnitude of the union members' forced "investment" (this argument apparently taking a page, or a whole metaphor, from securities law); and the proposal's inclusion of past-incurred training costs for pilots "above the line."

**91.** Or fifteen days would not have been spent in court.

or "just" result. So the question pops up immediately: may a debtor-in-possession that has met all of the statutory requirements be unseated at this point, by an exercise of discretion on the part of the presiding jurist?

Given the result from the sweep of analysis thus far, this case does not pose that issue in a pointed and potentially-dispositive way. Nonetheless, it does illuminate the manifest need to flesh out the terse and blithe wording of the statute, through some sort of judicial construction, if there is to be an application of this requirement that has any real integrity.

The enactment of § 1113 in the Bankruptcy Amendments and Federal Judgeship Act of 1984 was, of course, a response to the Supreme Court's decision in *Bildisco*. *E.g., In re Family Snacks, Inc.*, 257 B.R. at 890. In placing § 1113(c)(3) into the roster of requirements, Congress was resonating off the first, broad holding in *Bildisco:*

> [T]he Bankruptcy Court should permit rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract.

465 U.S. at 526, 104 S.Ct. 1188. The Supreme Court went on to make the following prescription:

> Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

> The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue.

465 U.S. at 527, 104 S.Ct. 1188.

When it reviewed *Bildisco* in framing its legislative response, Congress seems to have deferred to the Supreme Court's observation that an adjudication on the rejection of a collective bargaining agreement would necessarily involve a looser process of weighing and balancing of myriad disparate and competing interests. This very much mirrors the fact that a reorganization under Chapter 11 is a collective process fundamentally unlike civil litigation, with the possibility of significant impact on a multitude of parties that have very different relationships with the debtor and

distinct stakes in the case. In 1984, Congress certainly acted respectfully—not to mention prudently—in yielding to the courts' understanding of their own tools and processes.

Nonetheless, the expression of the deference did not carry forward the full sense of the *Bildisco* court's analysis. In *Bildisco*, clearly, the balancing of multi-fold considerations was to go to "[d]etermining what would constitute a successful rehabilitation." Congress obviously subsumed that consideration into the substantive prescriptions of § 1113(b)(1)(A), in the necessity element. The Supreme Court did not mention the need for a *separate* process of weighing equities, to be performed after all was said and done on the hard issues of dollars and cents, impact, and the like.[92]

■ Squaring off with this question in *Carey Transp.*, the Second Circuit "glean[ed] at least six permissible equitable considerations." At the same time, it noted that "many of [them] also factor into the other substantive requirements imposed by section 1113."[93] 816 F.2d at 93.

Those are (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma. *Id.* (citations omitted).

■ In this case, it is worthwhile (and not premature) to make an analysis under § 1113(c)(3), even though the Debtor's proposal fails on several other scattered requirements of § 1113—not the least because so many of these considerations have already been passed on in application of the other requirements of *American Provision Co.*

*Carey Transp.* sets a half-dozen considerations into play. On the record made here, one overrides the rest in its certainty and magnitude: the likelihood and consequences of liquidation if rejection is not permitted, which for present purposes is best read as meaning if the Debtor does not get the overall labor cost reduction that it structured into its first proposal.

The Debtor's evidence was sufficient to establish that it will not survive as an operating airline if it does not get the total reduction of 19.4%. Its management believed that it had to build the reduction into its cost structure for the Northwest CRJ bid, and that belief was borne out in fact. Taking even that drastic measure got the Debtor "into the running" for the

---

92. For this reason, the Second Circuit's early observation seems a bit pat: "... the 'balance of equities' [requirement of § 1113(c)(3)] codifies the unanimous holding set forth in the first part of *Bildisco* ..." *In re Century Brass Prods., Inc.*, 795 F.2d at 273. *See also Int'l Brotherhood of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1461 (10th Cir.1986). The placement of such a consideration into a separate statutory subsection suggests that something more is required.

93. This means that the *Carey Transp.* court did not really resolve the conundrum suggested earlier, of how to make sense of the inclusion of § 1113(c)(3) in the statute without rendering its content into surplusage. But, at this point, the observations in *Carey Transp.* are all we have by way of analysis from a Court of Appeals.

bid, but by no means assured it of winning on Northwest's first review.[94] A baseline of presentation to Northwest was established by the sharp competition for the CRJ work. Northwest is overtly looking to a proffer of significant rate reduction for the Saab flying, whether it puts it out on RFP or not.[95] With those two processes ongoing, the Debtor really has no choice but to seek the concessions, or to obtain the reductions by imposition, if it is to remain a viable operator in a market that has drastically changed. Finally, and unfortunately, there is no bankable possibility of regaining ground through any "economy of scale" with future business expansion. If the Debtor does not obtain the concessions and put them into operation, liquidation is inevitable. If the issue were to persist as unresolved into this summer, that may come sooner rather than later.[96]

And, finally, the consequence of liquidation most pertinent to this matter would be that *all* the unions' members would lose their present employment, immediately after the cash ran out, and far in advance of any completed liquidation process. *Cf. In re Horsehead Indus., Inc.*, 300 B.R. at 587.

Most directly arrayed against this is the unions' projected outcome, encompassed by the third factor under *Carey Transp.* For the record, representative-witnesses for all three unions voiced an unbending intent on the part of the unions' leadership to call a strike if the Debtor were granted relief under § 1113 and it then rejected and imposed. On that, the unions elicited fairly short and summary testimony from the Debtor's executives on cross-examination, to the effect that the Debtor "could not withstand a strike." The implication of this seems to be that the Debtor could not staff enough flights to maintain operations, requiring it to terminate its going concern. In that instance, of course, liquidation would follow in short order.

This, of course, was the opposing doomsday scenario projected during the proceedings on this motion.[97] We are, apparently, to believe that a strike is utterly unavoidable, and that it would be so universally supported that it would bring down the Debtor's operation. This, then, is supposed to make rejection-and-imposition a nuclear option that simply should not be countenanced.

As noted repeatedly throughout, the depth of the employees' sense of betrayal and outrage cannot be demeaned or minimized. Nor can the drastic blow of consummated wage and benefit cuts to their households' solvency be denied. Nonetheless, all of the dynamics here are inescapably controlled by economics. If any corner of them is under anyone's control, it lies on

**94.** The unions produced no evidence to the contrary, as to the Debtor's competitiveness under an assumed reduction of labor costs in this specific instance.

**95.** Spanjers testified that in dealing with Northwest the Debtor was making every effort to "head off" the issuance of an RFP on the Saab flying. But the testimony from Northwest's executive showed that an opening for competitive bids was still very much a possibility.

**96.** There is nothing of record to counter the Debtor's projection of running out of cash on

its own means by late August, 2006. A failure to reach resolution on labor cost issues might deter any prospective DIP lender from making a commitment to the Debtor. This would make the "cash-negative" date the outside trigger for that variant of a doomsday scenario.

**97.** The semblance of this Hobson's choice, fabricated by two sides shrieking their positions in an uncompromising fashion, did not exactly make a joy of presiding over this motion.

the part of the unions' leadership in their option of strike, or on the part of individual union members in their decision whether to abide by the call for one. There could be give on either of these points such that either a strike would not be called, or it would not deprive the Debtor of a critical mass of its current, ready workforce.[98] Or, in the last instance, at an added unknowable stretch, the Debtor could somehow cobble together a workforce of non-union new hires quickly enough to hold a flight schedule together.[99] The likelihood of any of these permutations being sufficient to hold off a cessation of operations is essentially unmeasurable on the record at bar. But the fact remains that there is *some* likelihood of a going concern seeing its way out, on one path among these or another.

There is none, however, if deep labor cost reductions are not imposed. As a result, the first *Carey Transp.* factor decisively outweighs the third, and it tips the balance of equities toward rejection.

The fifth *Carey Transp.* factor can be addressed on the same basic fact considerations. It is almost grotesque to say so, given the numbers of raw dollars in question compared between the Debtor's annual sales revenue (even as it will be reduced) and any individual's wage rate. However, the matter of "cost-spreading abilities"—understood as the ability to absorb the brunt of a consummation of the opposing party's position—weighs in favor of the Debtor. It has made the showing that there simply will be no give in its financial structure to enable survival, with the ongoing diminution of revenue, the limitations on its future profitability, and the resultant mismatching of its existing labor cost structure. Given individuals within the Debtor's present workforce would have the ability to make do under the proposal, or some variant of it that was still based on the target reduction. This is most likely for pilots, the most highly-paid of the Debtor's union groupings in raw dollars, and least likely for low-tenured flight attendants.[100] There may not be many such who could, and there may not be enough who would care to put up with the cuts to make up a workforce to staff a full flying operation.[101]

So, as small in heart as it sounds to say it, the fifth factor also weighs in favor of rejection.[102]

---

98. The Debtor's management is on record as saying that even a rejection and imposition would not be a bar to continuing negotiations with the unions toward a different structure for a more lasting resolution.

99. Executives of both the Debtor and MAIR testified that there had been no contingency planning for such an eventuality. That evidence stands as uncontroverted. This is why the noted conclusion is pretty much speculative.

100. AFA's evidence presented the haunting and unchallenged picture of flight attendants with less than five years of seniority ending up with wage rates barely above federal poverty levels for income, if their households contain any number of dependents. This is an utter horror. But on the macro-economics of this case, the outcome is unavoidable. And that has to drive the whole analysis, under the statute.

101. The evidence on this point was incomplete, vague, and impressionistic. However, it left open the possibility that the Debtor might ultimately take the largest blow from the proposed cuts, if it is simply unable to attract new, capable flight attendants with the wages it would offer.

102. And, it must be said: a comparison of the reduced compensation rates with those afforded by others in the industry simply does not factor in, given the Debtor's overriding need to compete with other regional airlines on the bottom line. The Debtor has not allowed any consideration of its ability to compete generally for hiring in the labor market to sway its decision-making on this whole

The second and fourth factors under *Carey Transp.* go more to the interests of other constituencies in the case, i.e., the holders of allowed claims against the estate. In a broad sense, these factors look to how the outcomes under § 1113 would affect these parties' interests in receiving distribution on account of their claims. The Debtor and its unions presented so little probative evidence on these points that there is no way to engage in defensible fact-finding or ruling on these factors.

Finally, the sixth *Carey Transp.* factor does not decisively weigh in favor of either side. The Debtor started a comprehensive and hard-headed analysis of its business prospects as soon as the disaster of September, 2005 broke. It then proceeded on this motion in a methodical fashion. It can be said that the Debtor acted enough in good faith throughout.[103] To a degree, the unions' leadership refused to turn their heads to look at the basilisk until the beginning of 2006. However, when the eventuality of this motion was clear, they did devote enough resources to analyzing the Debtor's position and theirs. Some of the unions' testimony on matters of economics evidenced a continuing avoidance of the big picture, as to larger and specific aspects of the Debtor's proposal.[104] But, in the last instance, the unions made an attempt to meet the Debtor's case head-on that was thoroughgoing enough. Each of them made alternate proposals, though the

degree of responsiveness to the real problem varied greatly. So they, too, acted in sufficient good faith to address the Debtor's financial dilemma.

On a balancing of all of these factors, the equities obviously favor rejection, in that such would enable the Debtor to impose a labor cost structure that would fall within its reduced ability to pay, and thus would permit the Debtor to return to long-term financial stability after reorganization in bankruptcy.

### Conclusion, as to Debtor's Case Pertaining to Unions' Collective Bargaining Agreements

On the very extended and complicated record made for this motion, and after the longest evidentiary hearing in the history of this Court, the Debtor met most of the procedural prerequisites and substantive requirements to obtain court authorization for it to reject its collective bargaining agreements with its unions. Because it did not establish the bases for every last one, however, the motion at bar must be denied as it pertains to those agreements.

### II. Remedy of Rejection, as Invoked Against MAIR-ALPA Agreement.

There is one last issue that the Debtor pressed via this motion, a matter that both parties argued as part of the general flow of their analysis structured by *American*

---

matter. That is its right to choose, however it may be hanged by that eventually.

**103.** One large evidencing of this took place in bargaining conducted after the beginning of this motion (and thus technically not relevant to the central analysis here). The Debtor's proposal to AMFA contained provisions regarding the scope and work rules that AMFA's representatives read as a free authority to contract out maintenance and other mechanical work to third parties, potentially to the full gutting of the AMFA-represented component of the Debtor's workforce. After

some head-butting on the issue, the Debtor withdrew all of the challenged language from its offer. This was a huge concession to AMFA and its members—particularly in light of what happened in August, 2005, to AMFA's members who were employed by Northwest. It is quite unlikely that the Debtor deliberately included the provision as a throw-away—there was real economic benefit to be gained by it—so its deletion did reflect a sense of give-and-take on the Debtor's part.

**104.** *See, e.g.,* testimony identified *supra* at n. 53, p. 734 and n. 83, p. 750.

*Provision Co.* On closer inspection, this issue is revealed as fundamentally different from the main controversy of §§ 1113 and 365 as applied to the Debtor's collective bargaining agreements—so much so that it should be segregated and analyzed in its own right. And, ultimately, the reason is that its legal disposition is determined at a level deeper than the substance of those statutes.

At some point before the Debtor finalized the terms of the 2004 collective bargaining agreement with ALPA, MAIR purchased Big Sky Transportation Co. For public consumption, Paul Foley commented that MAIR intended to use Big Sky Transportation Co. to pursue opportunities for growth.

This made ALPA's leadership concerned, particularly about the possibility that this would result in Big Sky Transportation Co. supplanting the Debtor as a bidder for future airlinkservice work for mainlines, at MAIR's instigation. (This fear may have even extended to the possibility of Big Sky Transportation Co. replacing the Debtor on particular packages of flying for Northwest, after the expiration of then-current ASAs.) [105]

In connection with the concurrent negotiations on amendment of its collective bargaining agreement with the Debtor, ALPA sought MAIR's assurance that it would use the Debtor as the vehicle for any further growth in flying from which MAIR sought an ultimate share of profits.

The Debtor's labor counsel refused to have such a covenant put into an amended collective bargaining agreement, or to ask MAIR to execute such a collective bargaining agreement as a named party.

ALPA, however, did reach an agreement with MAIR on the issue. MAIR made assurances of not diverting future flying arrangements away from the Debtor to Big Sky Transportation Co., on specific terms.[106] This accord was memorialized in a January 30, 2004 letter of agreement executed by ALPA and MAIR. The Debtor's management refused to sign this letter. A copy of it was appended to the 2004 ALPA collective bargaining agreement as ultimately memorialized, as an appendix.

The only reference to the 2004 ALPA collective bargaining agreement in the letter of agreement was a covenant by MAIR "to be bound by Section 1 of" the collective bargaining agreement. Section 1, titled "Recognition and Scope," is the basic acknowledgment by the Debtor that ALPA was the exclusive bargaining agent of the Debtor's pilots. It also contains the terms defining the "scope"—that is, the restrictions on the Debtor's exercise of control over its physical fleet or volume of flying insofar as that exercise might impact on ALPA pilots' retention of their jobs.

As part of the relief it prayed for on this motion, the Debtor sought authority to "reject" the MAIR–ALPA agreement, i.e., to have the court determine that the binding effect of it was abrogated at the Debtor's instance under color of § 1113.

It is not really clear what the Debtor seeks to parlay this toward, at least as

105. ALPA does not represent the pilots at Big Sky Transportation Co.

106. These terms effectively limited the sort of flying that Big Sky Transportation Co. could engage in, to that which the Debtor was not then operating, and which it would likely not operate in the future. It also addressed the possibility of MAIR establishing a new airline-subsidiary. It set forth the rights of ALPA and those of its pilot-members on Debtor's payroll in relation to the establishment of such a company and the individual employment opportunities that it might offer to those pilots. It is not necessary to recapitulate the terms in any detail other than this description of general subject matter.

expressed in such terms. That may be due in large part to the fact that the request is so far off-base. The reason for that takes us down to a more basic level than either side articulated in their arguments.

Whether on its own terms or against its conceptual ancestry in § 365, § 1113 contemplates the rejection of a collective bargaining agreement *to which the debtor-in-possession was bound as a party pre-petition.* This is so because the debtor-in-possession that is expressly empowered under § 1113(a) is equated with the debtor that filed the petition, unless a trustee has been appointed to serve for the Chapter 11 case. 11 U.S.C. § 1101(1). In turn, § 365 gives a trustee the right to reject "any executory contract ... *of the debtor,*" 11 U.S.C. § 365(a) (emphasis added), and a debtor-in-possession in Chapter 11 has "all the rights ... and powers ... of a trustee," 11 U.S.C. § 1107(a).

■ The bedrock precept here is that in Chapter 11 a pre-petition contract is subject to the abrogation of rejection at the instance of a debtor-in-possession only if the debtor itself had entered into the contract as a party before its bankruptcy filing and was legally bound by it in its own right.

By its very terms, by the signatures attached to indicate assent, and by all of the Debtor's and MAIR's conduct before and after the entry into the January 30, 2004 MAIR–ALPA agreement, the Debtor simply was not a party to it.

As a result, this contract simply is not subject to the remedy of rejection at the Debtor's instance in this case. The arguments to the contrary are strained sophis-

try. And the Debtor's motion for that relief is denied, on just that simple a basis.

## OBSERVATIONS

Clearly, this is not a conclusive resolution of the issues between the Debtor and its unions, even to the extent that they sound under § 1113 alone. For that reason, and for its content, the permutation of outcomes in this order is probably none too pleasing to *any* party. However, as promised throughout the hearing, all issues were called just as dictated by the record and the Court's reading of the legal authorities.

In the string of hearings leading up to the long one, and for a while at the beginning of that hearing, counsel and several witnesses persisted in referring to the possibility of "the court rejecting the union contracts." As abjured from the bench, and as layered throughout this decision, the Bankruptcy Code does not provide for the court, in its own right, doing any such thing.[107]

Upon court authorization—obtained only after full satisfaction of a complex set of statutory requirements—the debtor-in-possession has that power. But even if authorized and then executed, both the debtor-in-possession and its unions still retain very significant power over their own, *joint* future. The configuration of their roles allows them to pass that power back and forth.

If authorized to reject, the Debtor *could* decide not to do so, however unlikely that would be after a bruising and expensive contest like the one just past. Even if it rejected, the Debtor could choose not to impose its own terms of employment, im-

---

**107.** The phraseology is an unfortunate product of the lazy verbal shorthand favored by lawyers, not to mention simplistic imprecision on the part of journalists. Nicely enough, this hearing was characterized by little of the first and none of the second, on this deceptively brief but portentous reference.

mediately or even at all. Again, the latter would be quite odd, but a deferral of imposition might be warranted if the possibility of doing that were added to the arsenal to be brandished during a process of more focused bargaining.

In the event of imposition, a union could call a strike, bringing that extension of economic power to play *if* it had the legal right to do so in a context like the one at bar.[108] Or—no surprise—the union could choose not to do so immediately, placing that correlate weapon onto the end of the bargaining table for show during negotiations in a more concentrated state of attention.

The point in this spinning-out of permutations is that both sides here always had a substantial power over their own future. The findings in this order were made in such detail in the hopes that the parties would give deference to them when they took up that power, by recognizing the limitations imposed by the looming operational insolvency of their common enterprise. Such guidance is all the more that can be given; the Bankruptcy Court has no power to structure, impose, or force a specific solution on these parties. *But, with the entry of this order, the parties now have the full range of their power back.* On this state of proceedings in the case, the Court has done its job, and can do nothing else as a formal matter.

Clearly, the parties can—*and should*—continue efforts toward a consensual resolution. (Voluntary mediation between ALPA and the Debtor was pending when the deadline for rendering of this decision was reached.)

The question would then be, what could happen after that?

If, despite the findings just made, the unions continue to be obdurate about the depth of concessions that are required to permit the Debtor to survive as a going concern, the parties can "bargain" in the mind-set of traditional labor law until the money runs out. Then the Debtor would shut down. Or, the Debtor can remedy the defects in its original proposal, set a reasonably short period for the unions to respond and to reach a resolution under § 1113. If no response is forthcoming, the Debtor could make a renewed motion which would be heard promptly.

In all likelihood, that second § 1113 hearing would be much shorter than the one that necessitated this decision. And if the Debtor seriously addresses the rulings just made, clearly evidencing that, the hearing would take little time in the absolute. If after all that the Court were to authorize the Debtor to reject the collective bargaining agreements and the Debtor did so, what will be, will be—in the matter of a strike.

### ORDER

On the memorandum of decision just made,

IT IS HEREBY ORDERED that the Debtor's motion for authority under § 1113 is denied:

a. without prejudice, as to its collective bargaining agreements with ALPA, AFA, and AMFA; and

b. with prejudice as to the January 30, 2004 agreement between MAIR and ALPA.

---

**108.** The parties have already telegraphed this issue as a possibility, so the phrasing as con-

jecture is quite deliberate.